## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| KETTERING ADVENTIST HEALTHCARE D/B/A KETTERING HEALTH NETWORK, | : : : | Case No. 3:25-cv-00273 |
| Plaintiff, | : : | |
| v. | : : | Judge Walter H. Rice |
| SANDRA COLLIER, et al., | : : : | Magistrate Judge Caroline H. Gentry |
| Defendants. | : | |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS

## I.     INTRODUCTION

On August 25, 2025, Defendants Sandra Collier ("Collier") and Mary T. Scott ("Scott") (together, "Defendants") filed their "12(B)(6) Motion to Dismiss and Alternatively, Rule 56 Motion for Summary Judgment" seeking to dismiss the Complaint[1] of Plaintiff Kettering Adventist Healthcare d/b/a Kettering Health Network ("Kettering") (the "Motion"). (Doc. #13). The Court should deny Defendants' Motion.[2]

## II.     STATEMENT OF ALLEGED FACTS

### A.     Kettering's Clinical Research Institute and the IRG Department

Kettering is a non-profit system of medical centers, emergency centers, and outpatient facilities that serve southwest Ohio. (Doc. #1, ¶ 9). Kettering's Research Institute has a robust

---

[1] Defendants have not moved to dismiss the entirety of Kettering's Complaint, but only Counts I, II, III, V, and VI; thus, leaving Count IV (Breach of Contract—Confidentiality Agreement) against Collier remaining.

[2] The Court has already denied Defendants' request to convert their Motion into one for summary judgment. (Doc. #31, PageID 1096).

clinical research program through which it contracts with industry-sponsored pharmaceutical and device partners ("Sponsors") to conduct clinical research trials. (*Id*.).

Within the Research Institute is the Innovation, Research, and Grants Department ("IRG"), which is responsible for, among other things, clinical trials. (*Id*. at ¶ 10). Through its clinical trials program, the IRG connects patients to new medicines, protocols, and treatment options—advancing the level of care available to the community. (*Id*.). A team of experts, including physicians, advanced practice providers, nurses, pharmacists, and research coordinators, perform this research. (*Id*.). To protect privacy and keep patients safe, an Institutional Review Board ("IRB") reviews every clinical trial. (*Id*.).

Kettering competes with other healthcare systems across the world for clinical trial work from Sponsors and has spent years and millions of dollars building and growing its clinical research program. (*Id*. at ¶ 11). The clinical trial work conducted by the IRG could result in $750,000 to $1.5 million in annual revenue to Kettering. (*Id*.).

**B. <u>Kettering's Efforts to Protect Its Confidential and Proprietary Information, as well as the Confidential and Proprietary Information of Its Sponsors</u>**

Kettering has policies, procedures and systems in place that protect its confidential and proprietary information from disclosure to others; the measures Kettering adopted help prevent improper access to, or diversion of, Kettering's confidential and propriety information, and are intended to preclude rogue actors from using Kettering's information for improper or unlawful purposes. (Doc. #1, ¶ 12; Doc. #1-5, PageID 76-83). Kettering requires all employees to sign, as a condition of their employment, an Information Security, Privacy, and Confidentiality Agreement ("Confidentiality Agreement"), pursuant to which each Kettering employee agrees not to disclose confidential information to third parties or use any such information for non-job-related purposes. (Doc. #1, ¶ 13; Doc. #1-5).

Kettering also requires its employees to complete online training modules that address confidentiality and information security, including "HIPAA, Privacy Rule," "HIPAA, Security Rule," and "Information Security, Privacy, and Confidentiality Agreement." (Doc. #1, ¶ 14). Collier completed each of these modules during her orientation on April 10, 2025. (*Id*.).

Kettering's Confidentiality Agreement policy states that "[b]y signing the [Confidentiality] Agreement, [employees] acknowledge their understanding that confidential information is not to be accessed, used, discussed, or disclosed with others, except as allowed by policy, applicable laws/regulations, and patient authorizations." (*Id*. at ¶ 15). Kettering's Conduct and Discipline policy similarly prohibits employees from, among other things: (a) accessing or disclosing patient, employee, or Kettering health records, including PHI, without authorization; (b) using computers improperly; (c) stealing; and (d) breaching confidentiality. (*Id*. at ¶ 16).

In addition to its own policies and Confidentiality Agreement, the IRG also enters into strict confidentiality and non-disclosure agreements with its Sponsors to maintain the confidentiality of the sensitive and proprietary information necessary to conduct clinical trials involving drugs and novel therapies in a highly competitive pharmaceutical market. (*Id*. at ¶¶ 17a-d). As System Director for the Department, Collier was aware of these contractual obligations, and despite that knowledge, misappropriated Sponsor information in violation of the agreements. (*Id*. at ¶ 17).

Due to the sensitivity of the work performed in the IRG, Kettering restricts physical access to the suite in which the IRG is located by, among other things, requiring employees to use a key to enter. (*Id*. at ¶ 18). Inside the suite is a locked cabinet accessed with a keypad, and inside the cabinet is the key to the office in which regulatory binders containing clinical trial information are kept. (*Id*.). Additionally, patient binders, which also contain clinical trial information, are stored in the Clinical Research Coordinator ("CRC") offices. (*Id*.). The CRC offices require badge access

(limited to IRG members) and within those offices are locked filing cabinets in which the patient binders are stored. (*Id*.). The industry standard, which Kettering follows, is to keep the information contained in both types of binders secured behind at least two locks. (*Id*.).

Kettering also restricts access to its computer systems by, among other things, maintaining advanced computer security systems and requiring the entry of a username and password to gain access to Kettering's computer system, which includes trade secrets, as well as confidential and proprietary information. (*Id*. at ¶ 19).

### C. Collier's Employment with Kettering

Kettering hired Collier on April 10, 2025 as its System Director of the IRG. (Doc. #1, ¶ 20). That same day, Collier digitally executed the Confidentiality Agreement. (*Id*. at ¶ 21; Doc. #1-5). By signing the Confidentiality Agreement, Collier agreed to:

1. Access, use, and disclose Confidential Information in keeping with the above-mentioned policies and only an on job-related need-to-know basis. (Doc. #1, ¶ 23; Doc. #1-5).

2. [N]ot disclose Confidential Information to […] anyone […] except as permitted by Kettering Health policies and procedures as well as applicable law and regulation in order to carry out my responsibilities as required to perform my work[.]" (*Id*.).

3. "[P]rotect the confidentiality of all Confidential Information, while employed by Kettering Health and after I leave Kettering Health." (Doc. #1, ¶ 24; Doc. #1-5).

4. "All Confidential Information remain[ing] on the property of Kettering Health and may not be removed or kept by me when I leave Kettering Health[.]" (*Id*.).

Collier was responsible for, among other things, direction and oversight for sponsored research initiatives conducted within Kettering and in association with collaborative research partners; oversight in the day-to-day conduct of research operations; and sponsored research and clinical trials, including study-start-up, clinical trial agreement and budget negotiation, regulatory compliance, recruitment, enrollment, and trial execution. (Doc. #1, ¶ 25). As a result, Collier had

access to confidential, proprietary, and trade secret information, not only from Kettering, but also from its Sponsors and consultants. (*Id*. at ¶ 26).

Collier's tenure was short-lived due to her inability to successfully lead the IRG Department. (*Id*. at ¶ 28). Kettering suspended Collier on June 20, 2025. (*Id*.). During the suspension meeting, HR Manager Archie Jones instructed Collier that she was not permitted to access Kettering's computer systems, including email, nor was she permitted on site. (*Id*.). Kettering terminated Collier's employment, effective June 22, 2025. (*Id*. at ¶ 29).

Collier currently works as Director – Global Sales & Clinical Project Management for her own consulting business, The Collier Consortium. (*Id*. at ¶ 29; Doc. #1-6). In that role, Collier provides clinical data review, clinical project management, development and implementation of clinical specialty project plans, feasibility research, and development of clinical study-related trackers and monitoring tools. (*Id*.).

### D. Collier's and Scott's Attempt to Extort Kettering

On July 28, 2025, Kettering received a letter from attorney Scott on Collier's behalf. (Doc. #1, ¶ 30; Doc. #1-7) (the "Letter"). The Letter outlined various alleged claims and violations, including wire fraud, conspiracy, RICO violations, HIPAA breach, and employment discrimination. (*Id*.). Scott closed her Letter by demanding a payout in the "high eight-figure range," threatening that if Kettering did not negotiate in that range, she would notify a "list of regulatory agencies, sponsors, and [contract research organizations]." (Doc. #1, ¶ 30; Doc. #1-7, PageID 95). Scott also threatened to "immediately issue a Press Release to national and local media outlets[3] […] to disclose the serious violations outlined above publicly." (*Id*.). Scott then attached draft letters to various Sponsors, as well as a press release. Scott threatened that "the amount Ms.

---

[3] "NBC, ABC, CBS, CNN, The New York Times, The Washington Post, STAT News, Reuters, The Associated Press, and National Public Radio (NPR)." (Doc. #1, ¶ 31; Doc. #1-7, PageID 96).

Collier will ultimately accept pales in comparison to the financial consequences the hospital will suffer from fines, statutory penalties, sanctions and legal expenses…[n]ot to mention the operational liability, loss of licensures, loss of funding, and the imposition of criminal penalties that will likely be imposed once this information becomes public." (Doc. #1-7, PageID 95).

Scott's Letter also effectively admitted that Collier stole the following documents and information from Kettering: (a) "[i]nternal emails and meeting notes between research staff, principal investigators (PIs), and administrators;" (b) "[r]ecordings and transcripts of meetings with hospital executives and compliance officers;" (c) "compliance plans;" (d) "[r]edacted patient logs;"[4] and (e) "[c]hecklists and audit logs." (Doc. #1, ¶ 32; Doc. #1-7, PageID 97). This was in addition to the theft Kettering subsequently uncovered.

### E. **Collier's Theft of Confidential and Proprietary Information from Kettering.**

Following its receipt of Scott's Letter, Kettering promptly began an investigation, which included a review of Collier's Kettering email account, which revealed that Collier had been forwarding emails from her Kettering account to her personal Gmail account (collierclinicalresearch2@gmail.com) as early as April 24, 2025. (Doc. #1, ¶ 33).

Between April 24 and June 20, 2025, the day Kettering suspended her, Collier forwarded at least 122 emails and attachments to her personal Gmail account. (*Id*. at ¶ 34). Many of these emails and attachments contained Kettering's and/or its Sponsors' confidential and trade secret information, including information regarding (1) Kettering's operations, business and strategic plans, and financial information; and (2) Kettering's and its Sponsors' clinical trials, including trial protocols, confidential drug information, agreements, trial processes and procedures, and trial results (which contain PHI). (*Id*.).

---

[4] The PHI Collier sent to herself via email was **not** redacted. (Doc. #1, ¶ 34(e)(ii), (xv), (xix); ¶ 34(f)).

During Collier's suspension meeting, Kettering informed her that she was not authorized to access Kettering's computer systems, including her email account. (*Id*. at ¶ 35). Kettering subsequently terminated Collier's employment, effective June 22, 2025. (*Id*. at ¶ 36).

Though Kettering had expressly revoked her authorization to access Kettering's computer systems, Collier continued to access her Kettering email account without authorization between June 25, 2025 and July, 11, 2025. (*Id*. at ¶ 36). *After* Kettering terminated her employment, Collier forwarded at least 189 emails and attachments out of her Kettering email account to her personal Gmail account *and* forwarded 63 of those emails and attachments containing Kettering's and Sponsors' confidential and trade secret information to a third party: vanessa@totalwellnessresearch.com. (*Id*.).

That email address in all likelihood belongs to Vanessa LeFebvre ("LeFebvre"), Manager of Clinical Trial Management at Innovaderm Research, Inc. (*Id*. at ¶ 37). Notably, Collier used LeFebvre as a reference when she applied to work at Kettering and also suggested that Kettering retain LeFebvre to conduct an independent audit of the IRG Department prior to termination of her employment. (*Id*.).

F. **Collier Continues to Attempt to Access Confidential and Proprietary Information**.

Between July 16-17, 2025—which was almost a month after Kettering terminated Collier's employment and informed her of its revocation of her previous authorization to access Kettering's computer systems—Collier unlawfully attempted to access Kettering's computer systems six times, but Kettering's information security system blocked her access. (*Id*. at ¶ 39). On July 17, 2025, Collier also attempted to access three different Kettering clinical studies that are under IRB oversight, misrepresenting that she was still affiliated with Kettering but using her personal email account. (*Id*. at ¶ 40). The IRB portals contain protocols, amendments, and patient-facing materials,

including informed consent forms and various types of serious adverse events and safety concerns, if any. (*Id.*).

## III.     LEGAL STANDARD

"At the motion to dismiss stage, a complaint…must 'state[ ] a claim for relief that is plausible, when measured against the elements' of a claim." *Doe v. BMG Sports, LLC*, 584 F. Supp. 3d 497, 506 (S.D. Ohio 2022) (quoting *Darby v. Childvine, Inc.*, 964 F.3d 440, 444 (6th Cir. 2020)). "[I]n other words, [Kettering] must make sufficient factual allegations that, taken as true, raise the likelihood of a legal claim that is more than possible, but indeed plausible." *Id.*

"In making that determination, the Court must 'construe the complaint [or counterclaim] in the light most favorable to the plaintiff [or counterclaimant], accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff [or counterclaimant].' " *Id.* (quoting *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008)). "Discovery, after all, is not meant to allow parties to discover whether a claim in fact exists, but rather to provide a process for gathering evidence to substantiate an already plausibly-stated claim." *Id.* (citing *Green v. Mason*, 504 F. Supp. 3d 813, 827 (S.D. Ohio 2020)).

## IV.     ARGUMENT[5]

### A.     Count VI (Civil Recovery for Criminal Extortion) Survives the Motion.

1.     **Kettering's extortion claim (Count VI) is based on O.R.C. § 2307.60, which permits civil recovery for criminal acts; here, Kettering has plausibly alleged Scott's extortion in violation of O.R.C. § 2905.11.**

Scott's assertion that "there is no standalone civil cause of action for extortion[,]" (Doc. #13, PageID 507), though technically true, is of no consequence. That is because Kettering's

---

[5] For ease of reference and clarity, Kettering responds to the arguments Defendants present in their Motion in the order they made them, not in the order of Kettering's claims in its Complaint.

extortion claim against Scott is not a "standalone" claim for extortion at all—it is a statutory claim under Ohio Revised Code ("O.R.C.") § 2307.60(A)(1), which provides:

> Anyone injured in person or property by a criminal act has, and may recover full damages in, a civil action unless specifically excepted by law, may recover the costs of maintaining the civil action and attorney's fees if authorized by any provision of the Rules of Civil Procedure or another section of the Revised Code or under the common law of this state, and may recover punitive or exemplary damages if authorized by section 2315.21 or another section of the Revised Code.

In short, "Section 2307.60(A)(1) creates a cause of action for the victim of a crime to 'recover full damages[.]'" *Brack v. Budish*, 539 F. Supp. 3d 794, 800 (N.D. Ohio 2021); *see also Albert v. Honda Dev. & Mfg. of Am., LLC*, No. 2:22-CV-3828, 2025 WL 2098006, at *10 (S.D. Ohio July 24, 2025) (O.R.C. § 2307.60 "provides civil recovery for criminal acts.").

Importantly, "[b]y its terms, [O.]R.C. § 2307.60 'does not require proof of an underlying criminal conviction[.]'" *Staton v. Perrone*, No. 1:24-CV-592, 2025 WL 976562, at *6 (S.D. Ohio Apr. 1, 2025) (quoting *Buddenberg v. Weisdack*, 161 N.E.3d 603, 606 (Ohio 2020)). Rather, O.R.C. § 2307.60 simply requires "a plaintiff [to] provide evidence on each element of the underlying criminal act and the plaintiff's damages resulting from that act." *Id.* (quoting *Gentry v. Silver Linings Agency*, 2024 WL 4863369, at *3 (Ohio Ct. App. 2024).

Here, the "underlying criminal act" at issue is extortion under O.R.C. § 2905.11, which provides, in relevant part, that:

> No person, with purpose to obtain any valuable thing or valuable benefit or to induce another to do an unlawful act, shall do any of the following: [...] (4) Utter or threaten any calumny against any person; [or] (5) Expose or threaten to expose any matter tending to subject any person to hatred, contempt, or ridicule, or to damage any person's personal or business repute[.]

9

O.R.C. § 2905.11(B). "Calumny is a somewhat old-fashioned equivalent of defamation" that "may refer to [...] the act of falsely and maliciously misrepresenting the word or actions of others, calculated to injure their reputations[.]" *GS Holistic LLC v. Wireless & Smoke, LLC*, No. 1:23-CV-748, 2024 WL 4109721, at *4 (S.D. Ohio Sept. 6, 2024), *report and recommendation adopted,* No. 1:23-CV-748, 2024 WL 4441736 (S.D. Ohio Oct. 8, 2024).[6]

Put together, this means Kettering "must plausibly allege" that (1) Scott, "with purpose to obtain any valuable thing or [...] benefit[;]" (2) (a) "made false or defamatory statements" about Kettering or (b) "[e]xpose[d] or threaten[ed] to expose any matter tending to subject [Kettering] to hatred, contempt, or ridicule, or to damage [Kettering's] [...] business repute[,]" (3) causing Kettering damages. *Staton*, 2025 WL 976562, at *6; *GS Holistic, LLC v. Wireless & Smoke LLC*, No. 1:23-CV-748, 2024 WL 4441736, at *4 (S.D. Ohio Oct. 8, 2024).

Kettering has done so. Specifically citing O.R.C. §§ 2307.60 and 2905.11, Kettering thoroughly alleges that: (1) "[u]nless Kettering paid Collier an amount 'in the high eight-figure range,' Scott affirmatively stated she would, without further notice, release" the information

---

[6] The Court should disregard the "elements" of "civil extortion" that Scott has manufactured to support the Motion. (Doc. #13, PageID 508). Scott first argues there is no claim of civil extortion under Ohio law, but then she lists five elements that a claim of civil extortion under Ohio law requires based on "Ohio law and federal precedents[.]" (*Id.*). If there is no civil claim of extortion under Ohio law, one might ask how Scott found "elements" for such a claim. The answer is not found in the cases Scott cites. *State v. Carter* does not exist. The citation Defendants provide (72 Ohio App.3d 553) corresponds to an unrelated decision, *Stull v. Combustion Eng'g, Inc.*, 595 N.E.2d 504 (Ohio Ct. App. 1991), and counsel for Kettering could not otherwise locate on Westlaw a *State v. Carter* case with even a fleeting relevance to extortion. Similarly, 2022-Ohio-3965—the Ohio WebCite that Defendants provide for an Ohio Tenth District Court of Appeals decision called *State v. Milam*—does not relate to a case of that name, but instead directs the reader to an Ohio Third District Court of Appeals decision called *State v. Eddy*. While *State v. Eddy* makes for interesting reading on the contours of jury instructions regarding the duty to retreat in cases of self-defense, its application to Kettering's civil claims against Defendants in general, or civil extortion in particular, is absent. *Eddy*, 2022-Ohio-3965, at ¶ 21. Although *Kenty v. Transamerica Premium Ins. Co.*, 650 N.E.2d 863 (Ohio 1995) is a correct citation, that case does not mention extortion, but instead discusses civil conspiracy and tortious interference with contract. Finally, *United States v. Pendergraft*, 297 F.3d 1198 (11th Cir. 2002) discusses criminal extortion under the federal Hobbs Act, but it does not discuss civil extortion, and the case is not decided under Ohio law; it certainly does not articulate any of the elements of a civil conspiracy claim that Defendants appear to have concocted. "Fabricating legal authority is serious misconduct that demands a serious sanction." *Johnson v. Dunn*, ---F.Supp. 3d---, 2025 WL 2086116, *1 (N.D. Ala. July 23, 2025) (sanctioning, on its own motion, lawyers for citing five ChatGPT AI-generated "problematic citations" across two motions).

contained in her Letter "within five business days" to "national and local media outlets[,]" including "NBC, ABC, CBS, CNN, The New York Times, The Washington Post, STAT News, Reuters, The Associated Press, and National Public Radio (NPR)[;]" (2) (a) at least seven different categories of statements in Scott's Letter were false; (b) that, as even Scott stated in her Letter, the false statements and charges in the Letter, if sent to the media, would "expose[ ]" Kettering to "[r]eputational and stockholder liability[;]" and (3) that Scott's extortion has caused Kettering damages, including "the costs incurred in maintaining this civil action, and attorneys' fees." (Doc. #1, PageID 10-11, 52-54).

Although, for palpable reasons, analogous conduct like Scott's is rare in the case law, in *Flatley v. Mauro*—inexplicably cited by Defendants in support of their Motion—the California Supreme Court held that strikingly similar allegations "constitute[d] criminal extortion as a matter of law." 139 P.3d 2, 22 (Cal. 2006). Indeed, California's highest court explained:

> At the core of Mauro's letter are threats to publicly accuse Flatley of rape and to report and publicly accuse him of other unspecified violations of various laws unless he "settled" by paying a sum of money to Robertson of which Mauro would receive 40 percent. In his follow-up phone calls, Mauro named the price of his and Robertson's silence as "seven figures" or, at minimum, $1 million. The key passage in Mauro's letter is at page 3 where Flatley is warned that, unless he settles, "an in-depth investigation" will be conducted into his personal assets to determine punitive damages and this information will then "BECOME A MATTER OF PUBLIC RECORD, AS IT MUST BE FILED WITH THE COURT.... [¶] Any and all information, including Immigration, Social Security Issuances and Use, and IRS and various State Tax Levies and information will be exposed. *We are positive the media worldwide will enjoy what they find*."

*Id.* at 21-22 (italicized emphasis added). Kettering has set forth allegations supported with non-conclusory facts that Scott engaged in conduct comprising each of the elements of extortion under Ohio law; therefore, Kettering has plausibly alleged a claim under O.R.C. 2307.60.

**2.  Scott's statements were not "privileged" or otherwise protected.**

Scott's efforts to otherwise immunize herself against her extortion fail, beginning with Scott's litigation privilege argument. (Doc. #13, PageID 507).

"The litigation privilege provides absolute immunity to parties, witnesses, lawyers, and judges from future lawsuits for *statements* made **during and relevant** to judicial proceedings." *Reister v. Gardner*, 174 N.E.3d 713, 716 (Ohio 2020) (italicized emphasis in original; bold emphasis added). Simply put, unless Scott is a time traveler, her statements in the Letter were not made "during" a "judicial proceeding" as Kettering filed this action *after and in response to* its receipt of Scott's Letter. While Scott's statements are *now* related to a judicial proceeding—again, which was filed, in part, because of her statements in the Letter—the litigation privilege "is not applicable […] to conduct that is simply connected in some way to litigation." *Id*.

Nor does the fact that Scott's statements in the Letter relate to Collier's so-called "statutory obligations[,]" "regulatory reporting[,]" or "compliance activities" bar Kettering's claim. (Doc. #13, PageID 509, 514). *Even if* "[i]nforming a party you will report their misconduct to appropriate authorities if corrective action is not taken does not constitute an unlawful threat," as Scott argues,[7] Scott conveniently ignores the most problematic aspect of her Letter: her threats to send the false information about Kettering to "NBC, ABC, CBS, CNN, The New York Times, The Washington Post, STAT News, Reuters, The Associated Press, and National Public Radio (NPR)" absent payment of up to $99,999,999. (Doc. #1, PageID 52-54). Scott does not cite, and Kettering is unaware of, any authority providing that a party is immune from extortion when sending press releases containing false and defamatory information to "national and local media outlets." (*Id*.).

---

[7] Kettering has italicized the phrase "even if" in this sentence primarily because, in yet another instance in which Scott has quoted legal authority that does not exist, nowhere in *United States v. Jackson*, 180 F.3d 55 (2d Cir. 1999) does the court utter the quoted sentence here.

In other words, while the "threat to file a civil lawsuit absent payment of a settlement does not constitute the criminal offense of attempted extortion[,]" Scott's Letter did so much more, crossing squarely into the territory of criminal activity. *See Argote-Romero v. LAZ Parking LTD., LLC*, 264 N.E.3d 859, 871 (Ohio Ct. App. 2025).

Finally, Scott's reliance on and characterization of Evidence Rule 408 is wildly off-base. In a civil case in federal court, that rule simply prohibits using statements made in settlement communications "to prove or disprove the validity or amount of a disputed claim[.]" Fed. R. Evid. 408(a)(1). Again, Plaintiff does not cite, and Kettering is unaware of, any authority providing that Fed. R. Evid. 408 may operate to completely bar a claim, based on illegal activity or not. Otherwise, a person, for instance, could threaten *any crime* (such as murder or kidnapping) and get away with it simply because the person said it in a letter proposing settlement of a dispute involving alleged regulatory non-compliance. Count VI withstands Defendants' Motion.

## B. Counts I and II (Trade Secrets Misappropriation) Survive the Motion.

### 1. DTSA/OUTSA claims are not limited to a trade secret's "owner," and the trade secrets at issue are not limited to clinical trial sponsor information.

As to Kettering's trade secrets claims against Collier under the federal Defend Trade Secrets Act ("DTSA") and the Ohio Uniform Trade Secrets Act ("OUTSA"), Defendants fleetingly assert those claims fail because "Kettering cannot assert trade-secret rights belonging to third-party sponsors." (Doc. #13, PageID 513).[8] In so arguing, Defendants fail to recognize that "[m]ore than one person or entity may enforce a trade secret. One party could hold legal title to a trade secret, while another may have equitable ownership of same. And either of those might license the trade secret to another." *Health Care Facilities Partners, LLC v. Diamond*, No. 5:21-

---

[8] "The definition of a trade secret and requirements for establishing misappropriation of trade secrets are substantially the same under the DTSA and OUTSA." *Corp. Lodging Consultants, Inc. v. Szafarski*, No. 1:21-CV-1611, 2021 WL 3709914, at *5 (N.D. Ohio Aug. 20, 2021).

CV-1070, 2023 WL 3847289, at *7 (N.D. Ohio June 5, 2023) (citing 18 U.S.C. § 1839(4)). Thus, "[a]ny of these [parties] could have standing to bring a claim[.]" *Id.*

Here, Kettering has plausibly alleged it has standing to bring its DTSA and OUTSA claims against Collier based on its Sponsors' clinical trial information. Indeed, Kettering has alleged that its "Research Institute also has a robust clinical research program through which it contracts with industry-sponsored pharmaceutical and device partners […] to conduct clinical trials." (Doc. #1, ¶ 9). And to enter into such contracts with its Sponsors, Kettering must "compete[ ] with other healthcare systems across the world," a process it "has spent many years and millions of dollars building[.]" (*Id.* at ¶ 11). Further, Kettering was contractually obligated to keep the information the Sponsors provided to it confidential and to use that information only for purposes of conducting the clinical trials. (*Id.* at ¶ 17). In short, Kettering has plausibly alleged that it holds equitable title or a license to the Sponsor's clinical trial information, which is sufficient to sustain its DTSA and OUTSA claims at this stage of the litigation.

### 2. Kettering plausibly alleged the trade secrets Collier misappropriated.

Regardless, Sponsor information is only one of two major categories of information Kettering plausibly alleged was a protected trade secret that Collier misappropriated. Undercutting Defendants' mistaken and conclusory suggestion that "the Complaint identifies only broad categories of information [sic] 'clinical data' and 'research processes'," (Doc. #13, PageID 512), Kettering specifically alleged that Collier misappropriated information containing (1) Kettering's operations, business and strategic plans, and financial information; and (2) Kettering's and its Sponsors' clinical trials, including trial protocols, confidential drug information, agreements, trial processes and procedures, and trial results. (Doc. #1, ¶¶ 34, 37). Kettering further alleged that

14

Collier sent this information "to her personal Gmail account" and "to a third party: vanessa@totalwellnessresearch.com." (*Id*.).

*Both* categories of information meet the definition of trade secrets under DTSA and OUTSA. Indeed, OUTSA defines "[t]rade secret" as information including, among other things, "scientific or technical information," "process, procedure," "compilation, program," "method, technique," or "any business information or plans, [and] financial information[.]" O.R.C. § 1333.61(D). Similarly, the DTSA defines the term "trade secret" as "all forms and types of financial, business, scientific, technical, economic, or engineering information[.]" 18 U.S.C. § 1839(3).

Further, *even if* there is a "particularity" requirement as Defendants argue,[9] Kettering could not have been more particular: In total, the Complaint contains more than 130 specific instances in which Kettering alleges Collier misappropriated its trade secrets, including specific dates, file names, and descriptions of those files. (Doc. #1, PageID 18-42). In fact, the very first item in the Complaint that Kettering alleges Collier misappropriated was "an internal Kettering presentation that contains confidential information regarding Kettering's operations[;]" in other words, "business information or plans" (i.e., trade secrets) completely unrelated to the Kettering's Sponsors' clinical trial information. (*Id*. at PageID 12, ¶ 34(a)). To be any more specific would require Kettering to publicly self-disclose its own trade secrets and confidential information on the Court's docket, which would defeat Kettering's very purpose in filing this lawsuit, which is to prevent further disclosure.

---

[9] The case Defendants cite on the "particularity requirement" has nothing to say about particularity whatsoever. *See Off. Depot, Inc. v. Impact Off. Prods., LLC*, 821 F. Supp. 2d 912 (N.D. Ohio 2011).

### 3.     Kettering plausibly alleged reasonable security measures.

Similarly, Kettering set forth numerous specific factual allegations demonstrating that it took reasonable security measures to protect the trade secrets Collier misappropriated. "Efforts to restrict physical access to trade secrets and requiring employees to execute confidentiality agreements have been found to be reasonable steps to protect trade secrets." *Corp. Lodging Consultants, Inc*., 2021 WL 3709914, at *7 (citing *Fred Siegel Co., LPA v. Arter & Hadden*, 707 N.E.2d 853, 862 (Ohio 1999) (finding trade secret status justified where defendant kept client list on a password-protected computer, kept hard copies in office cabinets which were sometimes locked, and "probably" told its employees that its customer list were confidential)). "The protection of computerized records through password-based access restrictions has also been deemed reasonable protection." *Corp. Lodging Consultants, Inc*., 2021 WL 3709914, at *7 (*The Rightthing, LLC v. Brown*, 2009 WL 249694 at *8 (N.D. Ohio Feb. 2, 2009)).

In the Complaint, Kettering catalogued the reasonable security measures it took to protect the trade secrets it alleges Collier misappropriated: (1) requiring employees to sign confidentiality agreements; (2) requiring employees to complete information security training modules; (3) physical restrictions with respect to the IRG Department; and (4) computer security measures like passwords. (Doc. #1, PageID 5-6). The security measures Kettering described in its Complaint are consistent with the measures that formed part of the cognizable trade-secret claims discussed in the preceding litany of cases. *See Corp. Lodging Consultants, Inc*., 2021 WL 3709914, at *7; *Fred Siegel Co., LPA*, 707 N.E.2d at 862; *The Rightthing, LLC*, 2009 WL 249694 at *8.

Thus, the Court may easily decline entertaining in any respect Defendants' argument that "Kettering fails to identify any trade secret with particularity or reasonable secrecy measures." (Doc. #13, PageID 506).[10] Counts I and II withstand Defendants' Motion

### C.    Count III (Computer Fraud and Abuse Act) Survives the Motion.

Defendants next argue Kettering's claim against Collier under the federal Computer Fraud and Abuse Act ("CFAA") fails because "Kettering directed personnel to use personal devices and email during a May 2025 outage" during which time she "accessed information with valid credentials issued by Kettering." (Doc. #13, PageID 512-513).

As an initial matter, Kettering's Complaint contains no allegations about this purported "May 2025 outage," and, because "[t]he Court's review of a Rule 12(b)(6) motion is generally confined to the four corners of a complaint" and any "exhibits attached to the complaint," the Court should decline to consider this argument. *LIZard Apparel & Promotions, LLC v. Impact Design, LLC*, No. 3:16-CV-238, 2017 WL 2061404, at *3 (S.D. Ohio May 11, 2017) (quoting *Thomas v. Noder-Love*, 621 Fed. App' x. 825, 828 (6th Cir. 2015)). In any event, Collier sent emails from her Kettering email account ("contain[ing] Kettering and/or its Sponsors' confidential and trade secret information") both *before and after* May 2025. (Doc. #1, PageID 11, 18). Indeed, the vast majority of the more than 130 specific instances of Collier exceeding her authorized access to Kettering's protected computer systems set forth in the Complaint occurred in June and July 2025, after this purported "outage." (*Id*., PageID 18-42).

Moreover, a person violates the CFAA in one of two ways: either by (1) "access[ing] a computer without authorization" *or* (2) "exceed[ing] authorized access." 18 U.S.C. § 1030(a)(2).

---

[10] The Sixth Circuit case Defendants cite on reasonable security measures, *In re Protech Indus*., does not appear to exist. Indeed, the citation Defendants provide (51 F.4th 714) corresponds to a 2022 Seventh Circuit decision, *U.S. v. Harris*, and the only case with a title including "In re Protech" Kettering's counsel could identify was *In re Protech Coating Servs., Inc.*, 479 B.R. 611 (Bankr. M.D. Fla. 2012).

While the CFAA itself does not define "authorization[,]" the term has been defined to mean "[o]fficial permission to do something; sanction or warrant." *Authorization*, Black's Law Dictionary (12th ed. 2024). "The term 'exceeds authorized access' is defined to mean 'to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter.'" *Van Buren v. United States*, 593 U.S. 374, 374 (2021) (quoting 18 U.S.C. § 1030(e)(6)). In *Van Buren*, the Supreme Court clarified that this means only when a person "accesses a computer with authorization but then obtains information located in particular areas of the computer—such as files, folders, or databases—that are off-limits" not when a person "misuse[s] access that they otherwise have." *Id*.

Regardless of the Supreme Court's definition of "exceeding authorized access" in *Van Buren*, Collier plainly engaged in conduct violating the CFAA's "without authorization" provision when she continued to access and use her email account *after she was suspended* and *specifically informed* she was no longer permitted to access Kettering's computer systems on June 20, 2025. (Doc. #1 at ¶ 35-36). Indeed, between June 25, 2025 and July 11, 2025, Collier nonetheless accessed her Kettering account *without authorization* and "forwarded approximately 189 emails and attachments out of her Kettering email account to her personal Gmail account" and 63 of those emails and attachments to vanessa@totalwellnessresearch.com. (*Id*. at ¶ 36). Count III withstands Defendants' Motion.

### D. Count V (Tortious Interference) Survives the Motion.

Finally, Defendants assert that Kettering's tortious interference claim must fail because it is "preempted by OUTSA." (Doc. #13, PageID 513). Plaintiff's argument is unavailing.

OUTSA preempts tort claims "based on the unauthorized use of information, even when the information is not a trade secret as defined by [OUTSA]." *Hanneman Fam. Funeral Home &*

*Crematorium v. Orians*, 235 N.E.3d 361, 366 (Ohio 2023). But "[w]here the state-law claim has a factual basis independent from the facts establishing the OUTSA claim, 'the portion of the claim supported by an independent factual basis survives preemption.'" *Stolle Mach. Co., LLC v. RAM Precision Indus.*, 605 F. App'x 473, 485 (6th Cir. 2015) (quoting *Miami Valley Mobile Health Services, Inc. v. ExamOne Worldwide, Inc.,* 852 F.Supp.2d 925, 940 (S.D. Ohio 2012)).

Here, Kettering's tortious interference claim has an independent factual basis: Kettering alleges that "[a]s System Director for the Department, Collier was aware of [Kettering's] contractual obligations [with its Sponsors] and despite that knowledge, misappropriated Sponsor information *in violation of the agreements*." (Doc. #1 at ¶ 17) (emphasis added). In other words, Count V is not about Collier's theft of *trade secrets*. Rather, Count V is about Collier's conduct tortiously interfering with Kettering's relationships with its Sponsors given contractual obligations like these: (1) "All information, including, but not limited to the Study Product or SPONSOR's operations, such as SPONSOR's patent application, formulas, manufacturing processes, basis scientific data, prior clinical data and formulation supplied by SPONSOR to [Kettering] and not previously published are considered confidential and shall remain the sole property of SPONSOR[;]" and (2) "[i]n view of Company's proprietary rights and interests, [Kettering] agrees to maintain as confidential all information received from or on behalf of Company or obtained as a result of performance of this Agreement or developed under a Study[.]" (*Id*.).

Contrasting Collier's conduct with that of the defendants in *Hanneman* is illustrative. There, "[the plaintiff's] complaint alleged that [the defendants] had tortiously interfered with [the plaintiff's] business contracts and business relationships by stealing [its] […] contracts including clientele names, contact information *and other trade secret information*[.]" *Hanneman*, 235 N.E.3d at 366–67 (emphasis added). In short, the plaintiff's complaint alleged that the defendants'

"actions were tortious because [they] stole trade secrets." *Id.* at 367. That's not what Kettering alleges. Kettering alleges Collier's actions were tortious because, as an employee of Kettering, she knowingly interfered with Kettering's contracts and relationships with its Sponsors. (Doc. #1, ¶¶ 87-90).

Kettering's tortious interference claim is not preempted by OUTSA, and Count V withstands Defendants' Motion.

V.    **CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' Motion. (Doc. #13).

Respectfully submitted:

*/s/ James G. Petrie*
James G. Petrie (0059446)
*Trial Attorney*
Jill K. Bigler (0083789)
Chris T. Page McGinnis (0099165)
Epstein Becker & Green, P.C.
250 West Street, Suite 300
Columbus, Ohio 43215
Phone: 614.872.2500
Fax: 614.633.1713
jpetrie@ebglaw.com
jbigler@ebglaw.com
cpagemcginnis@ebglaw.com

*Counsel for Plaintiff,*
*Kettering Adventist Healthcare*
*d/b/a Kettering Health Network*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 15, 2025, the foregoing *Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss* was served via the Court's electronic filing system on the following:

Mary T. Scott
7710 Reading Rd., Suite 102
Cincinnati, Ohio 45237
mtfoster@trinitylawllc.com

*Counsel for Defendant,*
*Sandra Collier*

Mary T. Scott
7710 Reading Rd., Suite 102
Cincinnati, Ohio 45237
mtfoster@trinitylawllc.com

*Pro Se Defendant*


*/s/ James G. Petrie*
James G. Petrie (0059446)