**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **KETTERING ADVENTIST HEALTHCARE D/B/A KETTERING HEALTH NETWORK**<br><br>Plaintiff-Counterclaim Defendant,<br><br>v.<br><br>**SANDRA COLLIER, et al.**<br><br>Defendants-Counterclaim Plaintiffs, and<br>Third-Party Plaintiffs,<br><br>v.<br><br>**EPSTEIN BECKER & GREEN, P.C., et al.**<br><br>Third-Party Defendants. | Case No.: 3:25-cv-00273<br><br>Judge Walter H. Rice<br><br>Magistrate Judge Caroline H. Gentry |

**REPLY IN SUPPORT OF THIRD-PARTY DEFENDANTS EPSTEIN BECKER & GREEN, P.C., JAMES G. PETRIE, JILL K. BIGLER, AND CHRIS T. PAGE MCGINNIS'S MOTION TO DISMISS THE FIRST AMENDED THIRD-PARTY COMPLAINT FILED BY SANDRA COLLIER AND MARY T. SCOTT**

**I.     Introduction[1]**

Scott and Collier's opposition fails to overcome the compelling grounds for dismissal set forth in the EBG Third-Party Defendants' Motion to Dismiss.  Moreover, the opposition relies on a series of hallucinated, non-existent cases undermining its credibility.  And, even where cases do exist, Scott and Collier frequently mischaracterize holdings of the cited cases.  At no time do Scott and Collier present any reasons, much less any compelling reasons, why the absolute litigation

---

[1] Scott and Collier did not file a brief in opposition to Kettering's Motion to Dismiss the Third-Party Plaintiffs' First Amended Counterclaim (Doc. # 73), and this Reply only responds on behalf of the EBG Third-Party Defendants in support of their Motion to Dismiss (Doc. # 91).

privilege should not operate to insulate the EBG Third-Party Defendants from civil liability for the statements they have made to the Court in this litigation.

Therefore, the claims against the EBG Third-Party Defendants fail as a matter of law, and dismissal is warranted with respect to all of them.

## II. The Third-Party Plaintiffs' Opposition to the EBG Third-Party Defendants' Motion to Dismiss Relies on Fabricated Cases

The Third-Party Plaintiffs' Motion [sic] in Opposition ("Opp. to MTD") (Doc. # 93) to the EBG Third-Party Defendants' Motion to Dismiss (Doc. # 91) begins with a full-throated defense of the Letter[2] Scott sent to Kettering, which threatened Kettering with harmful media exposure if it did not pay Collier between $50,000,000 and $100,000,000. (Doc. # 93, at PageID 1758; *see also* Doc. # 11-1, at PageID 231-232).  The Letter, which Scott and Collier characterize as "professionally written, accurate, and non-threatening," was – in their telling – "a lawful, protected communication under *State ex rel. Ellis v. Cleveland Mun. Sch. Dist.*, 2015-Ohio-760, and *Dart Indus. Co. v. Hurd*, 66 Ohio St.2d 280 (1981)." (Doc. # 93, at PageID 1758).

Unfortunately, like other non-existent authorities the Third-Party Plaintiffs have cited to the Court during this litigation, *Ellis* and *Hurd* simply do not exist.[3]  The full *Ellis* case name cited by the Third-Party Plaintiffs appears to be associated with a federal court decision from the Northern District of Ohio, but that decision concerns a discovery dispute and the protection of information under FERPA; it has nothing to do with demand letters, extortionate or otherwise. *See Ellis v. Cleveland Mun. Sch. Dist.*, 309 F. Supp. 2d 1019 (N.D. Ohio 2004).  Confusingly, the Ohio

---

[2] The EBG Third-Party Defendants use the same defined terms that they set forth in their Motion to Dismiss (Doc. # 91).

[3] *See, e.g.*, Plaintiffs' Memo. in Opp. to Defendants' Motion to Dismiss, at 10 (Doc. # 44, at PageID 1213) (noting Third-Party Plaintiffs' citation to several non-existent cases in their Motion to Dismiss (Doc. # 13) and drawing the Court's attention to a decision from the Northern District of Alabama, where, *sua sponte*, the court sanctioned lawyers for citing five Chat GPT AI-generated fake citations in two motions) (citing *Johnson v. Dunn*, ---F.Supp. 3d ---, 2025 WL 2086116, at *1 (N.D. Ala. July 23, 2025).

state-court WebCite the Third-Party Plaintiffs provide for the non-existent *Ellis* decision (2015-Ohio-760) takes the reader to a three-sentence order from the Ohio Supreme Court, which granted *pro hac vice* admission in a case styled *Westgate Ford Truck Sales, Inc. v. Ford Motor Co.*, 141 Ohio St.3d 1483 (2015).  The *Westgate* decision says precisely nothing about lawful or protected communications, the litigation privilege, or anything else germane to the Third-Party Plaintiffs' claims against Kettering's lawyers.

In a regrettably similar fashion, the citation Third-Party Plaintiffs list for the non-existent *Hurd* case leads the reader to a concurring opinion from Justice Holmes in *State ex rel. Voss v. Northwest Local Bd. of Ed.*, 66 Ohio St.2d 280 (1981), a case that dealt with mandamus and teacher tenure, but which contains nothing relevant to the current proceedings in general, or the Third-Party Plaintiffs' description of their Letter as a "lawful, protected communication" in particular. (Doc. # 93, at PageID 1758).

"Every lawyer knows that citing fake cases in a court filing is a terrible decision." *Johnson*, 2025 WL 2086116, at *11.  "In the few years that generative AI has affected court filings, it has become well established that '[m]any harms flow from the submission of fake opinions.'" *Id.*, quoting *Mata v. Avianca, Inc.*, 678 F. Supp. 3d 443, 448 (S.D.N.Y. 2023) (collecting cases).  As the court in the *Johnson* case explained, "harms" that arise from lawyers' citation of fake cases are legion, and include, among others:

- The opposing party wastes time and money in exposing the deception.

- The client may be deprived of arguments based on authentic judicial precedents.

- There is potential harm to the reputation of judges and courts whose names are falsely invoked as authors of the bogus opinions and to the reputation of a party attributed with fictional conduct.

*Johnson*, 2025 WL 2086116, at \*11 (citations omitted).  The court in *Johnson*, on its own motion, imposed a panoply of sanctions on several of the offending attorneys.  *Id*., at \*21.

The EBG Third-Party Defendants raise the Third-Party Plaintiffs' citation of fabricated legal authorities in the interest of upholding the duty of candor toward the tribunal; focusing on the meritorious reasons for dismissal, they do not, at this time, make a separate motion for sanctions.

As explained more fully below, on the occasions when the Third-Party Plaintiffs cite cases in their Opp. to MTD that actually exist, their arguments fare little better against the overwhelming amount of precedent in favor of dismissal.

### III. The Third-Party Plaintiffs' Arguments About the Litigation Privilege Misstate the Law and Serve Only to Underscore the Absolute Litigation Privilege's Application to Defeat Every One of the Claims Against the EBG Third-Party Defendants

#### a. The Litigation Privilege Applies to the Third-Party Plaintiffs' Claims Against the EBG Third-Party Defendants (Reply to Argument IV(A))

In response to the litany of cases in which courts dismissed claims against lawyers for statements made in connection with judicial proceedings, which the EBG Third-Party Defendants catalogued in their Motion to Dismiss (*see* Doc. #91, at PageID 1727–1730), Third-Party Plaintiffs mistakenly posit that the absolute litigation privilege "does not extend to extrajudicial or collateral actions undertaken to obtain strategic advantage, nor to bad-faith 'pre-litigation' communications unconnected to a legitimate claim." (Doc. # 93, at PageID 1758).  Third-Party Plaintiffs cite *Hecht v. Levin*, 66 Ohio St.3d 458, 460–62 (1993) and *Erie County Farmers' Ins. Co. v. Crecelius*, 122 Ohio St. 210, 171 N.E. 97 (1930) for this purported exception to the litigation privilege.  (*Id.*).

These cases say nothing of the kind.  In fact, the *Hecht* case stands for precisely the opposite proposition than the one the Third-Party Plaintiffs claim it does.  In *Hecht*, the Supreme Court of

4

Ohio held that filing a grievance against a lawyer with a local bar association constituted a judicial proceeding within the meaning of the *Surace* case, concluding that filing such a grievance cannot give rise to civil liability due to the operation of the litigation privilege. *Hecht*, 66 Ohio St.3d 458, at Syll. ¶ 2 (approving and following *Surace v. Wuliger*, 25 Ohio St.3d 229 (1986)).

Likewise, in the *Crecelius* case, an insured sued his insurance company for libel because, in the insured's earlier suit to recover for the loss of a building, the company had stated in its answer that the insured's loss "was of incendiary origin and was caused by the willful act of the plaintiff . . ." *Crecelius*, 122 Ohio St. at 210. The insured won that coverage dispute; later, he sued the insurance company for libel based on the statements its counsel made in pleadings, claiming that the company's statements had been "false and malicious and intended to injure the good name of [the insured]." *Id.* at 212. The Supreme Court of Ohio held that, even if the statements the insurance company made in its pleading had been "untrue, malicious, and not in good faith," because they were made in connection with a pleading in a lawsuit, the "absolute privilege" applied, and the insured's claims against his insurer failed. *Id.* at 214.

In that 1930 decision, the Supreme Court of Ohio explained "[t]he reason for the rule of absolute privilege," stating that:

> [T]he rule found its origin in the feeling that great mischief would result if witnesses in courts of justice were not at liberty to speak freely, and if they could not feel an assurance that they would not be subject to suits for slander and libel as a result of testimony freely given. **It is of course equally necessary that attorneys should be fully protected in counseling testimony, pleadings, and other proceedings in the usual and regular course of the trial of litigated cases, and for the same reasons that other court officials, including the judge who hears and decides causes, may be unfettered in the discharge of official duties, and may not be deterred from a fearless performance of official duties by a fear of actions for defamation**.

*Crecelius*, 122 Ohio St. at 214–15 (emphasis added).

Having noted the unqualified and absolute scope of the litigation privilege, the Supreme Court of Ohio acknowledged that, by articulating such a staunch privilege, there would be occasions when a person might be defamed in judicial proceedings, but could not maintain a civil action to recover for any claimed damages: "The rule is grounded upon public policy, and it is of course recognized that as an incidental result **it may in some instances afford immunity to the evil disposed and the malignant slanderer**." *Id.* at 215 (emphasis added). While the EBG Third-Party Defendants eschew the sobriquets of "evil disposed" or "malignant slanderer[s]," even if those descriptions aptly described the EBG Third-Party Defendants, the Third-Party Plaintiffs' claims against them would still fail.

*Crecelius* underscores the strength of the absolute privilege's application to defeat the Third-Party Plaintiffs' claims against the EBG Third-Party Defendants; it certainly lends no succor to the Third-Party Plaintiffs' mistaken argument that the presence of strategic motives, ill will, or bad faith on the part of the EBG Third-Party Defendants could somehow resurrect Scott's and Collier's otherwise fatally deficient third-party claims.

Next, the Third-Party Plaintiffs elide the absolute litigation privilege and substitute a separate, weaker, and qualified defense to defamation claims. (Doc. # 93, at PageID 1759, citing *Hahn v. Kotten*, 43 Ohio St.2d 237 (1975); *A&B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 11–12 (1995)). The law affords a qualified privilege to speakers when a statement is "'fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs, in matters where his interest is concerned.'" *Hahn*, 43 Ohio St.2d at 244 (quoting Prosser, LAW OF TORTS (4th ed.) 786, Sec. 115) (finding qualified privilege defeated claim because no evidence of actual malice; not discussing absolute litigation privilege, presumably because no party argued that the company's

6

communications with its customers were reasonably connected with litigation).  While that qualified privilege may be overcome with a showing of actual malice, that is not the case with the absolute litigation privilege.  *Compare Hahn*, 43 Ohio St.2d at 245 *with Surace*, 25 Ohio St.3d 229, as Syll. ("As a matter of public policy, under the doctrine of absolute privilege in a judicial proceeding, a claim alleging that a defamatory statement was made in a written pleading does not state a cause of action where the allegedly defamatory statement bears some reasonable relation to the judicial proceeding in which it appears.").

The Supreme Court of Ohio's valedictory to its *Surace* decision bears repeating in response to the Third-Party Plaintiffs' attempts to erode, soften, or diminish the absolute litigation privilege that covers the EBG Third-Party Defendants' advocacy on behalf of their client, in writing and in speech, in reasonable relation to these proceedings:

> In conclusion, we wish to re-emphasize the public policy considerations underlying the doctrine of absolute privilege in judicial proceedings . . . . The most basic goal of our judicial system is to afford litigants the opportunity to freely and fully discuss all the various aspects of a case in order to assist the court in determining the truth, so that the decision it renders is both fair and just.  While the imposition of an absolute privilege in judicial proceedings **may prevent redress of particular scurrilous and defamatory allegations that tend to harm the reputation of the person defamed**, a contrary rule, in our view, would unduly stifle attorneys from zealously advancing the interests of their clients in possible violation of the Code of Professional Responsibility, and would clog court dockets with a multitude of lawsuits based upon allegedly defamatory statements made in other judicial proceedings.

*Surace*, 25 Ohio St. 3d at 235 (emphasis added).

Thus, "'[a]n attorney at law is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of, a judicial proceeding in which he participates as counsel, if it has some relation to the proceeding.'" *Krakora v. Gold*, No. 98 CA 141, 1999 WL 782758, *3 (7th Dist.) (quoting Restatement of Law 2d, Torts (1977), Section 586).

In *Krakora*, the defendant attorneys represented the insureds in a coverage dispute, and the insurance company wanted the claimants to take a polygraph examination with a particular polygraph examiner who the lawyers had encountered before, and whose methods they had impeached in a previous criminal proceeding. *Krakora*, 1999 WL 782758, at *1.  One of the claimants' lawyers sent a pre-litigation letter to the insurance company that criticized the competency or credibility of the polygraph examiner, and the examiner tried to sue the lawyers who sent the letter, claiming they had defamed him. *Id.*, at *1–2.  Though the lawyers who sent the purportedly defamatory letter had not yet filed the insurance-coverage lawsuit, the court granted summary judgment in favor of the defendant lawyers, finding that both the absolute litigation privilege, and the qualified privilege mentioned above, insulated the attorneys from liability for the statements they had made about the polygraph examiner. *Id.*, at *5.

In the face of the abundant Ohio caselaw regarding the absolute litigation privilege, Third-Party Plaintiffs point to two cases that permit the tort of abuse of process, claiming they support the following proposition:  "Moreover, the litigation privilege does not extend to tortious misuse of judicial process undertaken for an ulterior or retaliatory objective."  (Opp. to MTD, Doc. # 93, at PageID 1759, *citing Yaklevich v. Kemp, Schaeffer & Rowe Co.*, 68 Ohio St. 3d 294, 298–99, 626 N.E.2d 115 (1994); *Robb v. Chagrin Lagoons Yacht Club, Inc.*, 75 Ohio St. 3d 264, 271, 662 N.E.2d 9 (1996).  But in *Yaklevich*, the court simply held that abuse of process can stand as a separate claim from malicious prosecution, and *Robb* dealt with yacht club members who claimed to have been denied a fair hearing before they were expelled from the club; these cases say absolutely nothing about the litigation privilege.

Application of the absolute litigation privilege defeats all of the claims against the EBG Third-Party Defendants.

**b. Third-Party Plaintiffs Misstate Numerous Holdings, or Cite Inapposite Cases, to Support their "Collateral Purpose and Bad Faith" Argument (Reply to Argument IV(B))**

The Third-Party Plaintiffs rely again on the *Yaklevich* case in Section IV(B) "Collateral Purpose and Bad Faith" of their Opp. to MTD, citing it right before they say: "Courts have consistently held that retaliatory or bad-faith litigation tactics—those aimed at intimidation, reputational destruction, or attorney disqualification—fall outside any privilege and support causes of action for abuse of process, defamation, and retaliatory interference." (Doc. #93, at PageID 1760). Again, *Yaklevich* says nothing about the scope or bounds of the absolute litigation privilege, and thus has no application to the present case.

So too with the *Crawford v. Euclid National Bank* case, which the Third-Party Plaintiffs cite as "see also" support for the immediately preceding quotation from their Opp. to MTD about allegations that amount to reputational harm "fall[ing] outside any privilege . . ." (Doc. #93, at PageID 1760, *citing Crawford v. Euclid Nat'l Bank*, 19 Ohio St.3d 135, 139 (1985)). But *Crawford* did not discuss the litigation privilege; in fact, it did not discuss any privilege at all, and it also does not address litigation tactics aimed at intimidation, reputation destruction, attorney disqualification, or the other topical areas for which the Third-Party Plaintiffs cite it. Instead, *Crawford* is a case in which the Ohio Supreme Court held that a malicious prosecution claim cannot lie absent an arrest or seizure of property. *Crawford*, 19 Ohio St.3d at 136–37. In *Crawford*, a homeowner's signature was falsified on a car loan application; after the loan was defaulted upon, the homeowner disclaimed ownership, but later took possession of the car after the police impounded it. The bank obtained a default judgment against the homeowner for the unpaid loan, which also led to an unfavorable interest rate on his mortgage. The owner sued the bank for malicious prosecution, but that claim failed because the homeowner-plaintiff had not

9

alleged the element of arrest of person or seizure of property.  *Id.*  *Crawford*'s holding and reasoning have no connection to the Third-Party Plaintiffs' claims against the EBG Third-Party Defendants.

In contrast to the inapplicable cases Scott and Collier cite, the salient case is *Hecht*, where the Ohio Supreme Court held that "[t]he [litigation] privilege exists . . . irrespective of whether the statement was made in bad faith."  *Hecht*, 66 Ohio St.3d at 462 (emphasis added).

    **c.  The Third-Party Plaintiffs Misstate Court Holdings and There Is No Support in the Caselaw for the Suggestion that, by Accusing Scott of Extortion and Thereby Impugning Her Character, the EBG Third-Party Defendants Somehow Voided the Absolute Litigation Privilege (Reply to Argument IV(C))**

Though the Third-Party Plaintiffs accurately recite the elements of per se defamation in Section IV(C) of the Opp. to MTD, they once again miss the point of the EBG Third-Party Defendants' Motion to Dismiss.  (*See* Doc. # 93, at PageID 1760–1761, citing three cases for the elements of per se defamation).

Even if Kettering, represented by the EBG Third-Party Defendants, did impugn Scott's professional reputation by characterizing—through court filings and written arguments in these proceedings—the Letter as extortionate, the purportedly defamatory nature of these statements cannot, as a matter of law, give rise to civil liability against the EBG Third-Party Defendants because of the operation of the absolute litigation privilege. *See Wasserman v. Weir*, No. 2:24-cv-3935, 2025 WL 1347253, \*4–5 (S.D. Ohio May 8, 2025) (finding that Plaintiff "does not dispute that the basis for her claims against [attorney defendant] is his statements during and relevant to state court judicial proceedings.  As such, her tort claims are barred by the litigation privilege and [attorney defendant] is granted judgment [on the pleadings] on those claims."); *Newman v. Univ. of Dayton*, 2021-Ohio-1609, ¶ 45 (2d Dist.) (granting judgment in favor of defendant attorney and her university client for statements made about the plaintiff in quasi-judicial proceedings;

10

explaining that litigation "privilege protected not only [the university's attorney] as the utterer of the statements at issue, but also the [university] defendants as 'parties' to the subject actions.") (citations omitted); *City of Dayton v. A.R. Env't, Inc.*, 886 F. Supp. 2d 775, 781 (S.D. Ohio 2012) (dismissing defamation claim against attorney where allegations made in complaint were absolutely privileged); *Deters v. Hammer*, No. 1:20-cv-00362, 2021 WL664011, at *4 (S.D. Ohio Feb. 19, 2021), *report and recommendation adopted*, 568 F. Supp. 3d 883 (S.D. Ohio 2021) (granting judgment in favor of defendant attorney by applying doctrine of absolute immunity to defeat false light claim); *Seminatore v. Dukes*, 2004-Ohio-6417, ¶ 26, 39–40 (defamation and other civil claims against attorneys properly dismissed under absolute litigation privilege).

Against the overwhelming arguments on this point that the EBG Third-Party Defendants set forth in their Motion to Dismiss, the Third-Party Plaintiffs cite back to *Hecht* and *Surace* to support their mistaken argument that: "Since damages are presumed in defamation per se [cases], EBG's public filings accusing Ms. Scott of 'extortion' foreseeably caused reputational harm within the legal and professional community, satisfying the foreseeability standard articulated in *Hecht* . . . and *Surace*." (Doc. # 93, at PageID 1761).

Third-Party Plaintiffs erroneously suggest that *Hecht* and *Surace* said anything at all about foreseeability, much less that the litigation privilege might somehow fail to operate if a plaintiff artfully pleaded that a defendant-attorney's in-court statements impugned the plaintiff's professional character—*Hecht* and *Surace* say nothing of the sort. To the contrary, *Hecht* and *Surace* stand for the proposition that the absolute litigation privilege applies when the offending statement bears some reasonable relation to the judicial proceeding in which it appears. *Hecht*, 66 Ohio St. 3d 458, Syll.; *Surace v. Wuliger*, 25 Ohio St. 3d 229, Syll.

11

The Third-Party Plaintiffs' suggestion that either of these cases created an exception to the privilege's application if harm to a person's reputation was foreseeable flagrantly misstates these holdings.

> **d.  Third-Party Plaintiffs Mistakenly Argue that their IIED Claim Can Elude the Absolute Litigation Privilege Simply Because They Claim to Have Pleaded the Tort's Elements; They Wholly Ignore the Fact that the Complained-of Statements by the EBG Third-Party Defendants Occurred in Written Court Filings to Initiate and Prosecute This Case (Reply to Argument IV(D))**

Turning to Section IV(D) of the Opp. to MTD, regarding IIED, the Third-Party Plaintiffs continue to labor under the mistaken belief that if they simply recite the elements of a tort, they can somehow elude application of the litigation privilege.  (Doc. #93, at PageID 1761).  Not so.

Like all of their other claims against the EBG Third-Party Defendants, the IIED claims arise from statements that the EBG Third-Party Defendants made in Court filings related to this litigation; they are therefore privileged and cannot give rise to civil liability.  *Nationstar Mortg., L.L.C. v. Ritter*, 2015-Ohio-2900, ¶ 15 (10th Dist.) ("To the extent that the counterclaims for fraud, slander, and [IIED] are based on [lender's court filings] these claims are clearly barred by the doctrine of absolute privilege"); *Wells Fargo Bank, N.A. v. Johnson*, 2016-Ohio-1114, ¶ 26 (6th Dist.) (affirming Civ.R. 12(B)(6) dismissal of IIED counterclaim under doctrine of absolute privilege because it alleged "nothing beyond the filing of the foreclosure complaints and necessary statements and furtherance of the claims set forth therein"); *see* Motion to Dismiss, Doc # 91, at PageID 1735–1736.

The cases Third-Party Plaintiffs cite in Section IV(D) of their Opp. to MTD merely recognize the IIED tort (as in the *Yeager* case[4]), or discuss the type of severe emotional distress that could give rise to an IIED claim in the setting of a bystander (as in the *Paugh* case[5]).

---

[4] *Yeager v. Local Union 20*, 6 Ohio St. 3d 369 (1983).
[5] *Paugh v. Hanks*, 6 Ohio St. 3d 72 (1983).

(Doc. # 93, at PageID1761).  But the caselaw the EBG Third-Party Defendants cite above and in their Motion to Dismiss demonstrate that the absolute litigation privilege defeats the IIED claims; moreover, even if those claims were not subject to the litigation privilege, they would fail for the many reasons that Kettering articulated in its own Motion to Dismiss, which the Third-Party Plaintiffs neglected to oppose.  (Doc. #91, at PageID 1735–1736; *see* Doc. #73, at PageID 1523–1528).

### e. Though Their First Amended Complaint Does Not Contain a Tortious Interference Claim, Third-Party Plaintiffs Nevertheless Discuss it in Their Opp. to MTD (Reply to Argument IV(E))

The Third-Party Plaintiffs did not bring a tortious interference claim against the EBG Third-Party Defendants (or anyone else) in their FAT-PC.  Why they discuss it in their Opp. to MTD is unclear.

Even if they had brought a tortious interference claim, under the qualified privilege case they cite in Argument IV(E), such a claim still would have failed because the EBG Third-Party Defendants had a privilege to make statements about Scott and Collier in the filings they submitted to the Court in this litigation.  (*See* Doc. #93, at PageID 1761 (noting *A&B-Abell* case,[6] and stating that it "recognizes liability where a defendant intentionally **and without privilege** interferes with another's business relationships and causes resulting harm") (emphasis added)).

### f. Collier's ADA Discrimination and Retaliation Claim Fails Against the EBG Third-Party Defendants for Many Reasons, Starting with the Fact that She Was Not an EBG Employee (Reply to Argument IV(F))

Though she never claimed that EBG had employed her, Collier included EBG among the other Kettering-related targets to which Count III of the FAT-PC, for workplace retaliation, was directed.  (*See* Doc. # 28, at PageID 1065–1066).  The EBG Third-Party Defendants moved to

---

[6] *A&B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Const. Trades Council*, 73 Ohio St. 3d 1, 14–15 (1995).

dismiss this Count along with the rest of the third-party claims against them, arguing first that their court filings were subject to the litigation privilege, and further explaining that an employee may not maintain a retaliation claim against the attorneys who happen to represent her employer. (Doc. # 91, at PageID 1730–1731, citing *Diaz v. Lancore*, 751 F. App'x 755 (6th Cir. 2018), *Kelly v. First Data Corp.*, No. 1:19-cv-372, 2020 WL 419440, at *9 (S.D. Ohio Jan. 27, 2020), *report and recommendation adopted*, 2020 WL 3528653 (S.D. Ohio June 30, 2020)).

Collier spends a page of the Opp. to MTD trying to argue that certain "facts plausibly allege that **Kettering** discriminated and retaliated against Ms. Collier because of her disability and protected whistleblower activity, in violation of [the ADA]," but she does not even attempt to respond to the EBG Third-Party Defendants' argument that the retaliation claim against **EBG** fails under the absolute privilege or because Collier was not an EBG employee. This is puzzling because the Opp. to MTD is only addressed to the EBG Third-Party Defendants' Motion to Dismiss, not to Kettering's separate (and earlier) Motion to Dismiss. (Doc. # 93, at PageID 1762).

In any case, Collier's retaliation claim against EBG fails because the only basis for the claim against EBG arises from its attorneys' written filings in its Verified Complaint and TRO papers, because Collier was not an EBG employee, and because Collier failed to exhaust her administrative remedies. (*See* Doc. # 91, at PageID 1730–1731).

> **g. The *Yaklevich* Case Cannot Rehabilitate Scott's Abuse-of-Process Claim; Moreover, Scott Brought the Disqualification Upon Herself By Interposing Herself as a Fact Witness, Not Because She Was Named as a Party-Defendant in Kettering's Verified Complaint (Reply to Argument IV(G))**

Like the rest of the third-party claims against the EBG Third-Party Defendants, Scott's abuse-of-process claim arises from the EBG Third-Party Defendants' court filings to initiate this case and seek injunctive relief on behalf of their client. For that reason, the abuse-of-process claim against the EBG Third-Party Defendants fails as a matter of law under the absolute litigation

privilege. (*See* Motion to Dismiss, Doc. #91, at PageID 1733, citing, inter alia, *Schmidt v. Gross Law Office*, 2014-Ohio-4227, at ¶¶ 2, 17 (10th Dist.) (affirming trial court's dismissal of abuse-of-process claims made against attorney that "aros[e] out of communications made to the . . . court during the course of . . . [judicial] proceedings.")).

Scott says that her abuse-of-process claim against the EBG Third-Party Defendants should survive dismissal because the EBG attorneys' act of naming her as a Defendant in the Verified Complaint (for having sent the extortionate Letter to Kettering) was "a tactical maneuver designed to manufacture a perceived conflict of interest and thereby deprive [Collier] of her chosen counsel and weaken her legal position." (Doc. # 93, at PageID 1763). But EBG (acting on Kettering's behalf) only moved to disqualify Scott *after* she made herself a fact witness by filing a declaration based on personal knowledge. (*See* Doc. # 5, at Page ID 158). In other words, when they filed the Verified Complaint on their client's behalf, the EBG Third-Party Defendants could not have known that Scott would later create an unwaivable conflict of interest with her client by electing to submit a sworn declaration about the timing and means by which Collier purloined Kettering's confidential information. (*Id.*) Because Scott's abuse-of-process claim turns (if at all) on the EBG Third-Party Defendants' filing of the Verified Complaint and TRO papers, and because Kettering and EBG did not seek Scott's disqualification in those papers, the claim should fail.

Setting that timing component aside and turning to the arguments Scott musters in her Opp. to MTD, the conclusion remains that the abuse-of-process claim fails as a matter of law. Scott cites a single case, *Yaklevich*, to argue that by filing and prosecuting this case on Kettering's behalf, EBG and its attorneys exposed themselves to personal civil liability. (Doc. # 93, at PageID 1763, citing *Yaklevich*, 68 Ohio St. 3d at 298–99).

In *Yaklevich*, an attorney sued a law firm over the law firm's prior lawsuit against him, which had alleged that he improperly induced one of the firm's clients to terminate the law firm's representation. *Yaklevich*, 68 Ohio St. 3d at 295.  The attorney contended that the law firm had filed its earlier suit for an "ulterior purpose"—to pressure one of his clients (which had previously been a client of the law firm's) to discharge him and harm his reputation. *Id.*  The Ohio Supreme Court used the case to confirm that Ohio recognizes the tort of abuse of process and to address related issues concerning compulsory counterclaims and the applicable statute of limitations. *Id.* at 298–300.  The court ultimately held that the complaint adequately stated a claim for abuse of process; however, the law firm never asserted the litigation privilege as a defense to the claim, and the court did not consider the absolute privilege. *See id.* at 300.

Regardless, *Yaklevich* is distinguishable, its progeny has clarified its meaning, and its lack of analysis of the absolute litigation privilege diminishes its relevance.  As an initial matter, in *Yaklevich*, the lawyer and law firm were parties to the underlying litigation, not just the later abuse-of-process litigation—not so in our case, where the only thing Scott accuses EBG of doing is filing a lawsuit, seeking a TRO, and, once Scott made herself a witness, moving the Court to disqualify her.  That is quite different from the attorneys functioning as the real parties in interest in the litigation that preceded and gave rise to the *Yaklevich* case.

 Moreover, later cases clarify that "[a]buse of process does not lie for the wrongful bringing of an action, but for the improper use, or 'abuse,' of process once a proper claim has been commenced." *Gugliotta v. Morano*, 2005-Ohio-2570, ¶ 50 (holding that abuse-of-process claim should have failed as a matter of law because it was based merely on the initiation of litigation), citing, inter alia, *Kremer v. Cox*, 114 Ohio App. 3d 41, 51–52, 59 (9th Dist. 1996) (noting that

16

defendant pathologist's statements made in prior proceedings would have been subject to absolute privilege, and therefore would have been protected from surgeon's defamation claims).

In short, Scott's abuse-of-process claim—arising from the EBG attorneys' representation of Kettering to file this lawsuit and seek injunctive relief to prevent the theft and dissemination of Kettering's confidential information—fails as a matter of law in the face of the absolute litigation privilege, and even under the abuse-of-process caselaw Scott cites.  There was no prior proceeding in which the EBG Third-Party Defendants contorted an appropriately initiated legal process to accomplish improper ulterior goals; all they are accused of doing is representing their client to bring this action.  These are precisely the sort of claims that should fail in the face of the absolute litigation privilege; without it, each brief, argument, and in-court statement would carry the risk of a new claim or lawsuit against the lawyers, resulting in a never-ending cycle of accusation and recrimination.

Because the abuse-of-process claim fails on its own terms, and also fails under the litigation privilege, the Court should dismiss it.

### h. The RICO Claim Fails for Want of Standing, Want of Specificity, and Want of Allegations of Racketeering Activities (Reply to Argument IV(H))

Third-Party Plaintiffs superficially argue that they have sufficiently alleged an association-in-fact RICO enterprise to survive dismissal, but in doing so, they merely reference two cases that recite the elements of a civil RICO claim.  (Doc. # 93, at PageID 1764, citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985) and *Henrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393 (6th Cir. 2012)).

Other than regurgitating the elements and pronouncing that the FAT-PC "meets these elements" (Doc. # 93, at PageID 1764), the Third-Party Plaintiffs entirely fail to engage with the detailed and densely researched arguments that the EBG Third-Party Defendants presented in their

17

Motion to Dismiss.  (*See* Doc. # 91, at PageID 1739–1746).  The Third-Party Plaintiffs' only argument about the sufficiency of their RICO claim states:

> Communications with Kettering leadership, research administration, chief compliance officer, the principal investigators (PI), triggered potential sponsor scrutiny, providing the motive for coordinated concealment and retaliation.  The continuity requirement is satisfied because the retaliatory acts—beginning during employment and extending through post-termination litigation tactics carried out by EBG attorneys –reflect an ongoing pattern rather than isolated events.

(Doc. # 93, at PageID 1764).  This is not nearly enough to escape dismissal.

Collier and Scott lack standing to recover for a RICO violation because they only claim to have suffered some combination of retaliatory termination, reputational harm, emotional distress, and litigation costs; these personal and reputational injuries "are insufficient to support a civil RICO claim."  *Med. Marijuana, Inc. v. Horn*, 604 U.S. 593, 594 (2025); *see Kerik v. Tacopina*, 64 F. Supp. 3d 542, 561 (S.D.N.Y. 2014) ("reputational injuries are insufficient to support a civil RICO claim."); Doc. # 91, at PageID 1741.

Besides lacking standing, their allegations do not come close to containing the necessary specificity to withstand dismissal.  "[A] properly pled RICO claim must cogently allege activity 'that would show ongoing, coordinated behavior among the defendants that would constitute an association-in-fact.'"  *Begala v. PNC Bank, Ohio, Nat'l Ass'n*, 214 F.3d 776, 781 (6th Cir. 2000) (holding that recitation of "a string of entities allegedly comprising the enterprise, and then list[ing] a string of supposed racketeering activities" is not enough to sustain a RICO claim).  Scott's and Collier's "conclusory assertions d[o] not satisfy the basic requirements of the [RICO] statute."  *Britt v. Fox*, 110 F. App'x. 627, 628 (6th Cir. 2004) (affirming dismissal of RICO claims against lawyers); *see Palmer v. Nationwide Mut. Ins. Co.*, 945 F.2d 1371, 1376 (6th Cir. 1991) (affirming dismissal of RICO claims premised on lawyers' actions in presenting their client's legal arguments in litigation).

Along with the RICO claim's many other deficiencies, it lacks any detailed allegations of racketeering activities.  Scott and Collier certainly fail to "allege the time, place and contents of the [wire or mail] misrepresentation(s) upon which [they] relied." *Bender v. Southland Corp.*, 749 F.2d 1205, 1216 (6th Cir. 1984); *Komarek v. Conflict Int'l, Inc.*, No. 2:24-cv-1227, 2025 WL 948973, *5 (S.D. Ohio Mar. 29, 2025) ("Each of these elements must be alleged as to each defendant.").

While Scott and Collier ominously insinuate that the RICO enterprise included "Kettering leadership," at no time does the FAT-PC specify which individuals constituted Kettering's leadership; likewise, while the FAT-PC purports to direct the RICO claim against Kettering, EBG, and "Individual Third-Party Defendants," it does not distinguish among the three individual EBG attorneys and the fourteen current and former Kettering employees.  It certainly does not contain the "who, what, when [and] where" of the specific false statements or misrepresentations that drove the purported RICO scheme.  *FFP Holdings, LLC v. Moeller*, No. 3:14CV693V, 2014 WL 4322804, at *6 (N.D. Ohio Aug. 29, 2014); *see Bird v. Delacruz*, No. 04-CV-661, 2005 WL 1625303, *6 (S.D. Ohio July 6, 2006) (to state a valid mail or wire fraud claim under RICO, "the plaintiff must, within reason, describe the time, place, and content of the mail and wire communications, and it must identify the parties to those communications.") (internal quotations omitted).

To the limited degree that Scott and Collier provide any temporal specificity in their RICO claim, it only undercuts their case against the EBG Third-Party Defendants, who Scott and Collier say Kettering did not retain until *after* Scott sent the Letter, which was *after* Collier had been terminated, and *after* the purported research malfeasance and other supposed wrongdoing occurred.  (*See* Doc. # 28, at ¶ 20, PageID 1058).

While Scott and Collier recite some elements of a RICO claim, their FAT-PC is devoid of specific allegations to satisfy the heightened pleading standard that applies to this fraud-based claim, particularly as to the EBG Third-Party Defendants, whose only role was to represent their client in response to the Letter.  Scott and Collier lacked standing to bring the RICO claim, since their harms are personal and reputational, not related to their business or property.  And Scott and Collier cannot identify any money or property that they claim the EBG Third-Party Defendants "attempted to obtain by means of false or fraudulent pretenses, representations, or promises." *Cranel Inc. v. Pro Image Consultants Group*, LLC, 57 F.Supp.3d 838, 849 (S.D. Ohio 2014) (dismissing RICO claim for lack of specificity of pleading of wire fraud).

The RICO claim fails as a matter of law, and the Court should dismiss it, along with the balance of the FAT-PC, because it fails to state a claim for which relief may be granted.

## IV.     Conclusion

All of the third-party claims against the EBG Third-Party Defendants fail because those claims arise from the statements the EBG Third-Party Defendants made related to these judicial proceedings.  Whether made in the Verified Complaint, TRO papers, oral hearings, or otherwise in relation to this case, the things the EBG lawyers said and filed were privileged and cannot support any of the Third-Party Plaintiffs' claims against them.  The Court should dismiss all of the third-party claims against the EBG Third-Party Defendants.

Respectfully submitted,


/s/ *Jonathan T. Brollier*
Jonathan T. Brollier (0081172)
Epstein Becker & Green, P.C.
250 West Street, Suite 300
Columbus, Ohio 43215
Phone: 614.872.2500
Fax:    614.633.1713
jbrollier@ebglaw.com

Christopher  M.  Farella  (NY  3994449)
General Counsel
Jennifer O'Connor (NY 5297866)
Epstein Becker & Green, P.C.
875 Third Avenue
New York, New York 10022
Phone: 212.351.4500
Fax:    212.878.8600
cfarella@ebglaw.com
jeoconnor@ebglaw.com

*Counsel for Third-Party Defendants Epstein Becker & Green, P.C., James G. Petrie, Jill K. Bigler, and Chris Page McGinnis*

21

## CERTIFICATE OF SERVICE

I certify that on November 13, 2025, the foregoing *Reply in Support of Third-Party Defendants Epstein Becker & Green, P.C., James G. Petrie, Jill K. Bigler, and Chris Page McGinnis's Motion to Dismiss the First Amended Third-Party Complaint Filed by Sandra Collier and Mary T. Scott* was electronically filed using the Court's CM/ECF system and was automatically served to all counsel of record.

/s/ Jonathan T. Brollier
Jonathan T. Brollier (0081172)