THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

KETTERING ADVENTIST
HEALTHCARE, d/b/a KETTERING       :
HEALTH NETWORK,

        Plaintiff/Counter-               :
        Defendant,

        v.                               :        Case No. 3:25-cv-273

                                         :
SANDRA COLLIER, *et al.*,
                                         :        Judge Walter H. Rice
        Defendants/Counter-                       Mag. Judge Caroline H. Gentry
        Plaintiffs,                      :

        v.                               :

EPSTEIN BECKER & GREEN, PC,
*et al.*,                         :

        Third-Party Defendants.

---

DECISION AND ENTRY SUSTAINING MOTION TO DISMISS OF THIRD-PARTY
DEFENDANTS EPSTEIN BECKER & GREEN, PC, JAMES PETRIE, JILL BIGLER, AND
CHRISTOPHER PAGE MCGINNIS ("EBG DEFENDANTS") (DOC. #91);
COUNTERCLAIM AND THIRD-PARTY COMPLAINT OF DEFENDANTS/COUNTER-
PLAINTIFFS SANDRA COLLIER AND MARY T. SCOTT (DOC. #28) IS DISMISSED
WITH PREJUDICE AS TO CLAIMS AGAINST THE EBG DEFENDANTS; JUDGMENT
SHALL ULTIMATELY ENTER IN FAVOR OF THE EBG DEFENDANTS AND AGAINST
COLLIER AND SCOTT ON THE ABOVE; SCOTT AND H. LEON HEWITT, COUNSEL
FOR COLLIER, ARE ORDERED TO SHOW CAUSE WITHIN FOURTEEN (14) DAYS
OF ENTRY WHY THEY SHOULD NOT BE FOUND TO HAVE VIOLATED FEDERAL
RULE OF CIVIL PROCEDURE 11(b) AND HELD IN CONTEMPT OF COURT, AND
WHY THE COURT SHOULD NOT IMPOSE SANCTIONS, INCLUDING BUT NOT
LIMITED TO OVERRULING COLLIER AND SCOTT'S MOTION TO DISMISS (DOC.
#13) WITH PREJUDICE; UPON RESOLUTION OF THE SHOW CAUSE ORDER, THE

UNDERSIGNED INTENDS TO RECUSE HIMSELF FROM FURTHER PROCEEDINGS
IN THIS LITIGATION; THE DISTRICT JUDGE TO WHOM THE MATTER IS
REASSIGNED WILL ADJUDICATE THE MOTIONS TO DISMISS OF KETTERING
(DOC. #73) AND THAT OF THE INDIVIDUAL KETTERING EMPLOYEE
DEFENDANTS (DOC. #93); LIKEWISE, SHOULD COLLIER AND SCOTT'S MOTION
TO DISMISS (DOC. #13) REMAIN VIABLE, SAME WILL BE DECIDED BY THE
UNDERSIGNED'S SUCCESSOR AS JUDGE; ALSO, UPON RESOLUTION OF SHOW
CAUSE ORDER, THE UNDERSIGNED SHALL REPORT SCOTT AND HEWITT'S
CONDUCT TO THE CINCINNATI BAR ASSOCIATION GRIEVANCE COMMITTEE OR
THE SUPREME COURT OF OHIO OFFICE OF DISCIPLINARY COUNSEL

---

On August 13, 2025, Plaintiff Kettering Adventist Healthcare, d/b/a Kettering
Health Network ("Kettering"), filed suit in this Court against Defendants/Counter-
Plaintiffs Sandra Lee Collier and Mary T. Scott (hereinafter "Collier and Scott").
On August 25, 2025, Collier and Scott filed their Motion to Dismiss. (Collier and
Scott Motion, Doc. #13). On September 10, 2025, Collier and Scott filed their First
Amended Counterclaim and Third-Party Complaint (Amended Third-Party
Complaint, Doc. #28), naming as Third-Party Defendants, among others, Epstein
Becker & Green, PC ("EBG"), James Petrie, Jill Bigler, and Christopher Page
McGinnis, the latter three of whom are attorneys for EBG (collectively, "EBG
Defendants"). (*Id.* at PAGEID 1052). On October 27, 2025, the EBG Defendants
filed their Motion to Dismiss, arguing that all claims against them arise wholly
from the EBG Defendants' "statements made in these judicial proceedings, and
those are absolutely privileged under Ohio law." ("EBG Defendants' Motion,"
Doc. #91, PAGEID 1709, citing *M.J. DiCorpo, Inc. v. Sweeney*, 69 Ohio St. 3d 497,
505-07 (1994); *Surace v. Wuliger*, 25 Ohio St.3d 229, 233–34 (1986)). For the

reasons set forth below, the EBG Defendants' Motion to Dismiss (Doc. #91) is SUSTAINED. Additionally, the Court's review of Collier and Scott's Motion to Dismiss and subsequent filings have revealed significant bad faith[1] conduct by Scott and H. Leon Hewitt, counsel for Collier. Accordingly, Scott and Hewitt are ORDERED TO SHOW CAUSE why they should not be found to have violated Federal Rule of Civil Procedure 11(b) and held in contempt of this Court, and why this Court should not impose sanctions, including but not limited to overruling Collier and Scott's Motion to Dismiss (Doc. #13) with prejudice. Further, upon resolution of the show cause order, the undersigned intends to recuse himself from further proceedings and refer Scott and Hewitt to the Cincinnati Bar Association Grievance Committee or to the Supreme Court of Ohio Office of Disciplinary Counsel.

I.      **Factual Background and Procedural History**

   A.      **Collier and Scott's Motion to Dismiss (Doc. #13)**

   While the Court ultimately does not reach the merits of Collier and Scott's Motion to Dismiss, the facts giving rise to the suit and the filings associated with this Motion are essential to understanding the Court's conclusion that Collier's

---

[1] One might reasonably infer that Scott and Hewitt's conduct constituted fraud upon the Court. However, as discussed below, the leading cases on this issue have used bad faith as the standard for whether to impose sanctions for false citations. Thus, the Court conforms its analysis to that standard. "Bad faith" in such cases has been defined as "where an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent." *Johnson v. Dunn*, 792 F. Supp. 3d 1241, 1259 (S.D. Ala. 2025) (internal quotation marks and citation omitted).

counsel and Scott acted in sanctionable bad faith. Thus, the Court undertakes the following discussion:

As Collier and Scott's Motion arises under Federal Rule of Civil Procedure 12(b)(6) (Doc. #13, PAGEID 505), the Court accepts all well-pleaded factual allegations in the Kettering Complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). On April 10, 2025, Collier began as the System Director of Kettering's Research Institute and IRG Department, and signed an Information Security, Privacy, and Confidentiality Agreement ("Confidentiality Agreement"). (Doc. #1, PAGEID 4-5, 8, 9, ¶¶ 13, 20, 25). Kettering required Collier to sign the Confidentiality Agreement in furtherance of Kettering's "strict confidentiality and non-disclosure agreements with its [clinical trial] Sponsors." (*Id.* at PAGEID 5, ¶ 17). As System Director, "Collier had access to confidential, proprietary, and trade secret information, not only from Kettering, but also from its Sponsors and consultants." (*Id.* at PAGEID 9, ¶ 26). As part of the Confidentiality Agreement, Collier agreed to maintain confidentiality both during and after her employment with Kettering. (*Id.* at PAGEID 8-9, ¶ 24).

Collier's tenure with Kettering was short-lived, however, and "[a]fter Kettering received multiple complaints from IRG staff about Collier's unprofessional behavior and leadership style, Kettering suspended Collier on June 20, 2025." (Doc. #1, PAGEID 9, ¶ 28). Collier was terminated two days later, and formed her own company, The Collier Consortium. There, "Collier provides, among other things, clinical data review, clinical project management,

4

development and implementation of clinical specialty project plans, feasibility research, and development of clinical stud-related trackers and monitoring tools." (*Id.* at PAGEID 10, ¶ 29).

On July 28, 2025, Kettering received a letter from Scott, then serving as Collier's counsel, regarding Collier's termination. ("Demand Letter," Doc. #1, PAGEID 10, ¶ 30). The Demand Letter "alleged claims and violations, including wire fraud, conspiracy, RICO violations, HIPAA breach, and employment discrimination." (*Id.*). Scott and Collier threatened to inform regulatory agencies and "immediately issue a Press Release to national and local media outlets" detailing Kettering's malfeasance, unless Kettering agreed to Collier's demand of payment "begin[ning] in the high eight-figure range[.]" (*Id.*). Scott attached a draft press release to the letter. (*Id.* at PAGEID 10-11, ¶ 31).

The Demand Letter prompted Kettering to investigate Collier's former Kettering email account, finding out that, prior to termination, she had "forwarded approximately 122 emails and attachments to her personal Gmail account. Many of these emails and attachments contained Kettering's and/or its Sponsors' confidential and trade secret information." (Doc. #1, PAGEID 11, ¶ 34). Further, Kettering discovered that Collier continued to access her Kettering email account for three weeks post-termination, forwarding 189 emails to her personal Gmail account and 63 to a Vanessa LeFebvre, who had served as a reference when Collier applied to work at Kettering. (*Id.* at PAGEID 17-18, ¶¶ 36-37). Post-

5

termination, Collier also attempted to access confidential Kettering computer systems or databases, but was unsuccessful. (*Id.* at PAGEID 42, ¶¶ 39-41).

On August 13, 2025, Kettering filed suit, claiming that Collier violated the Defend Trade Secrets Act of 2016 ("DTSA") (Claim One, Doc. #1, PAGEID 44-46, ¶¶ 44-55), Ohio Uniform Trade Secrets Act ("OUTSA") (Claim Two, *id.* at PAGEID 46-48, ¶¶ 56-67), and the Computer Fraud and Abuse Act of 1986 ("CFAA"). (Claim Three, *Id.* at PAGEID 48-50, ¶¶ 68-79). Kettering further alleged that Collier's conduct breached the Confidentiality Agreement (Claim Four, *id.* at PAGEID 50-51, ¶¶ 80-85), and constituted Tortious Interference with the contracts between Kettering and its Sponsors. (Claim Five, *Id.* at PAGEID 51, ¶¶ 86-90). Finally, Plaintiff claimed that the demand letter constituted civil extortion by Scott. (Claim Six. (*Id.* at PAGEID 52-54, ¶¶ 91-103).

Also on August 13, 2025, Kettering filed a Motion for Temporary Restraining Order against Collier and Scott. (TRO Motion, Doc. #3).[2] Collier and Scott filed a memorandum *contra* the next day (Doc. #4), with Scott providing a Declaration (Doc. #4-1) which in part addressed the factual allegations in the Complaint and TRO Motion. On August 15, 2025, Kettering filed a Motion to Disqualify Scott as Collier's Counsel (Doc. #5), arguing that Scott "has made herself a necessary witness by submitting sworn testimony to the Court in the form of declarations that goes [*sic*] to the heart of each of Kettering's claims against Collier." (*Id.* at

---

[2] The Court never ruled on the TRO Motion, as the parties entered into a Standstill Agreement on August 15, 2025, which was memorialized by the Court on August 18, 2025. (Doc. #6).

PAGEID 151). On September 19, 2025, the Court disqualified Scott (Tr., Doc. #63), and on October 16, 2025, Hewitt entered a Notice of Appearance on behalf of Collier. (Doc. #80). Scott continues to represent herself.

On August 25, 2025, Collier and Scott, with Scott representing both herself and Collier, filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. (Doc. #13). Therein, Collier and Scott argue that civil extortion is not a recognized cause of action under Ohio law. (*Id.* at PAGEID 507, citing *Simpson v. Voiture Nationale La Société des Quarante Hommes*, 2d Dist. Montgomery No. 29016, 2021-Ohio-2131, ¶¶ 13-15 (Jun. 25, 2021); *First Fed. Bank of Ohio v. Angelini*, 3d Dist. Crawford No. 3-11-16, 2012-Ohio-2136, ¶ 6 (May 14, 2012); *Heskett v. Van Horn Title Agency, Inc.*, 10th Dist. Franklin No. 06-AP-549 2006-Ohio-6900, ¶ 26 (Dec. 26, 2006)).[3] Confusingly, Collier and Scott then set forth elements of a civil extortion claim "[u]nder Ohio law and federal precedents," which Kettering had alleged against Scott—wrongful threat; intent to obtain value or coerce; no legitimate claim or privilege; causation; and damages. (*Id.* at PAGEID 508, citing *United States v. Pendergraft*, 297 F.3d 1198, 1205 (11th Cir. 2002); *Kenty v. Transamerica Prem. Ins. Co.*, 72 Ohio St.3d 415, 419 (1995); *State v. Milam*, 2022-Ohio-3965 (10th Dist.); *State v. Carter*, 72 Ohio App.3d 553 (2d Dist. 1991)).

---

[3] Collier and Scott cite to the incorrect paragraphs in both *Simpson* and *Angelini*. While it appears that Collier and Scott relied upon the citation to *Angelini* in *Simpson*, the *Simpson* citation of *Angelini* was itself inaccurate. The Court reminds the parties of the importance of independently verifying internal citations.

Collier and Scott claim that the demand letter sent by Scott and Collier could not be a "wrongful threat," since there was no illegal conduct threatened in the letter, only the disclosure of Collier's intent to inform regulatory authorities of Kettering's unlawful practices. (Doc. #13, PAGEID 508-09, quoting *United States v. Jackson*, 180 F.3d 55, 70 (2d Cir. 1999)). They further assert that there was no illicit attempt to obtain value, because "[s]eeking a monetary settlement tied directly to legal claims does not become extortion merely because regulatory reporting is also contemplated." (*Id.* at PAGEID 509, quoting *Flatley v. Mauro*, 39 Cal.4th 299 (Cal. 2006)). Collier and Scott argue that Claim Six also fails because the demand letter was protected as a settlement communication, and that because Kettering was not induced by an unlawful threat to act, Kettering had failed to plead causation adequately. (*Id.* at PAGEID 510, quoting *Pendergraft*, 297 F.3d at 1205; *Kenty*, 72 Ohio St. 3d at 419). Finally, Collier and Scott assert that Kettering has not plausibly pleaded damages, because: (a) Collier's intended reporting to regulators is protected under both federal and Ohio law; and (b) the draft press release attached to the demand letter was merely "truthful disclosure of misconduct[,]" which is not extortion. (*Id.* at PAGEID 511, citing *Jackson*, 180 F.3d at 70; *Kulch v. Structural Fibers, Inc.*, 78 Ohio St. 3d 134, 150 (1997) (plurality opinion); *Flatley*, 39 Cal.4th at 330).[4]

---

[4] While *Kulch* is, in fact, a whistleblower retaliation case, *Jackson* and *Flatley* do not stand for the proposition that "[c]ourts consistently hold that truthful disclosure of misconduct does not constitute extortion." (Doc. #13, PAGEID 511).

8

Collier and Scott argue that Claims One and Two fail as matters of law as pleaded, because Kettering is not the owner of sponsor-created protocols, datasets, or monitoring correspondence. The Complaint identifies only broad categories of information 'clinical data' and 'research processes', which do not satisfy the particularity requirement." (Doc. #13, PAGEID 512, citing 18 U.S.C. § 1839(4); *Office Depot, Inc. v. Impact Office Prods., LLC*, 821 F. Supp. 2d 912, 919-23 (N.D. Ohio 2011)). Collier and Scott further assert that Kettering "fails to plead reasonable measures to maintain secrecy[,]" (*id.*), and that the OUTSA preempts Claim Five, which sounds in common law tort. (*Id.*, citing OHIO REV. CODE § 1333.67(A); *Stolle Mach., Inc. v. RAM Precision Indus.*, 605 F. App'x 473, 484 (6th Cir. 2015)).

Collier and Scott argue that Claim Three fails as a matter of law because Supreme Court and Sixth Circuit precedent define "exceeds authorized access" under the CFAA to exclude alleged "misuse of information obtained with authorized credentials." (Doc. #13, PAGEID 512-13, citing *Van Buren v. United States*, 593 U.S. 374, 380-86 (2021); *Royal Truck & Trailer Sales & Serv., Inc. v. Kraft*, 974 F.3d 756, 758-61 (6th Cir. 2020)). As Collier was directed to access confidential "information with valid credentials issued by Kettering[,]" Collier and Scott assert that Collier cannot be civilly liable under the CFAA, even if she exceeded the scope of her authorization once she accessed the information. (*Id.* at PAGEID 513).

9

In its memorandum *contra*, Kettering points out numerous problems with the cases upon which Collier and Scott rely when they set forth the purported elements of a civil extortion cause of action. Specifically, Kettering asserts that *Carter* and *Milam* do not exist, *Kenty* does not address extortion, and *Pendergraft* addresses only criminal extortion under federal law. (Doc. #44, PAGEID 1213 n.2). As discussed in greater detail *infra*, the Court's review of the cases accords with Kettering's representation, and, in fact, the Court discovered even more fabrications by Collier and Scott in its independent review. In their Reply memorandum, Collier and Scott do not address Kettering's assertions about the case citations. Indeed, despite being additionally warned by Kettering that three more cases either did not exist or did not stand for the propositions cited (Doc. #44, PAGEID 1215, 1218, 1220 nn.7, 9-10), Collier and Scott renewed their reliance on those cases and propositions in their Reply. (Doc. #69, PAGEID 1434-35, 36, citing *In re Protech*, 51 F.4th at 714; *Jackson*, 180 F.3d at 70; *Office Depot*, 821 F. Supp. 2d at 919-23). As of January 2, 2026, they have not amended their Reply and, thus, continue to rely on those cases.

### B.    EBG Defendants' Motion to Dismiss (Doc. #91)

As the EBG Defendants' Motion also arises under Rule 12(b)(6) (Doc. #91, PAGEID 1708), the Court again accepts all well-pleaded factual allegations in the Amended Third-Party Complaint as true. *Iqbal*, 556 U.S. at 678. In that pleading, Collier and Scott allege that Plaintiff/Counter-Defendant Kettering Adventist Healthcare, d/b/a Kettering Health Network ("Kettering"), retained the EBG

Defendants as counsel after receiving the Demand Letter. (Doc. #28, PAGEID 1058, ¶ 20). On August 13, 2025, the EBG Defendants, on Kettering's behalf, filed an Emergency Motion for Temporary Restraining Order. (*Id.* at ¶ 21, citing TRO Motion, Doc. #3). Collier and Scott claim that Kettering employees entered into a "civil conspiracy" with the EBG Defendants. (*Id.* at PAGEID 1062, ¶ 36).

Counter-Plaintiff Collier raises a single claim of Retaliation (Claim Three) against the EBG Defendants. Counter-Plaintiff Scott raises three individual claims against the EBG Defendants: Defamation and False Light (Claim Five), Abuse of Process (Claim Six), and Malicious Prosecution (Claim Seven). (Doc. #28, PAGEID 1065-67, 1068-73, ¶¶ 50-54, 60-75). Collier and Scott jointly raise claims of Intentional Infliction of Emotional Distress ("IIED," Claim Eight), Civil Conspiracy (Claim Nine), and Civil Racketeer Influenced and Corrupt Organizations ("Civil RICO," Claim Ten). (*Id.* at PAGEID 1073-77, ¶¶ 76-89). For Claim Three, Collier claims that EBG Defendants' filing of the TRO Motion was in retaliation for her protected whistleblower conduct. (*Id.* at PAGEID 1066, ¶ 52). As to Claim Five, Scott alleges that the EBG Defendants included material falsehoods in the TRO Motion, "publish[ing] these false statements to the Court and to opposing counsel[,]" (*id.* at PAGEID 1068-69, ¶¶ 61-63), "ensuring they became public record and permanently harming Ms. Scott's personal and professional reputation." (*Id.* at PAGEID 1069, ¶ 63). For Claim Six, Scott asserts that the TRO Motion and concomitant Motion to Disqualify Scott (Doc. #5) was an attempt to chill Collier's protected activity and intimidate both Scott and Collier. (*Id.* at PAGEID 1070-71, ¶¶

68-69). With respect to Claim Seven, Scott claims that through filing the TRO (*id.* at PAGEID 1072, ¶¶ 71-72), the EBG "Defendants acted with malice by weaponizing litigation to harass, intimidate, and suppress valid whistleblower claims rather than advocate the resolution of legitimate clams." (*Id.* at ¶ 74).

For Claim Eight, Collier and Scott allege that the EBG Defendants sought to intimidate and vilify Collier and Scott through their filing of the TRO Motion and Motion to Disqualify. (Doc. #28, PAGEID 1073-74, ¶¶ 77-78). In Claim Nine, Collier and Scott claim that the EBG Defendants conspired with Kettering to "[d]efame and discredit Ms. Collier by falsely accusing her of theft and [protected health information] violations"; and "[d]efame and discredit Ms. Scott by falsely accusing her of extortion[.]" (*Id.* at PAGEID 1075, ¶ 81). Collier and Scott assert that the EBG Defendants furthered this conspiracy by "draft[ing] filings that knowingly misstated facts[.]" (*Id.* at ¶ 82). Finally, in Claim Ten, Collier and Scott appear to allege that the EBG Defendants furthered their criminal enterprise with Kettering by retaliating against Collier and Scott through filing the Complaint, TRO Motion, and Motion to Disqualify. (*Id.* at PAGEID 1077, ¶ 86).

On October 29, 2025, the EBG Defendants moved to dismiss all claims against them, claiming that they "enjoy an absolute privilege under Ohio law for the statements they made in this lawsuit." (Doc. #91, PAGEID 1727). The EBG Defendants argue that the litigation privilege encompasses any statement made during a litigation proceeding that bears some relation to the proceeding, even if the statements are defamatory. (*Id.* at PAGEID 1727-28, quoting *Reister v.*

12

*Gardner,* 164 Ohio St.3d 546, 2020-Ohio-5484, ¶¶ 8, 14; *Surace,* 25 Ohio St. 3d 229 at paragraph one of syllabus; *Wasserman v. Weir*, No. 2:24-cv-3935, 2025 WL 1347253, *4 (S.D. Ohio May 8, 2025) (Morrison, C.J.)). The EBG Defendants assert that, while the privilege is most often applied in defamation claims, courts have consistently applied the privilege as an absolute bar to suit against all the state-law claims raised against them by Collier and Scott. (*Id.* at PAGEID 1728-29 (citations omitted)). Based on its wide application, the EBG Defendants claim that "the litigation privilege provides a complete and unassailable defense to every one of the claims against the EBG Third-Party Defendants because all of Scott's and Collier's claims are predicated on protected communications that the EBG Third-Party Defendants made in connection with this action." (*Id.* at PAGEID 1729-30).

In their memorandum *contra*, Collier and Scott argue that the litigation privilege does not apply, because it does not encompass extrajudicial statements or statements made before unrelated litigation was filed. (Memo. in Opp., Doc. #93, PAGEID 1758, citing *Hecht v. Levin,* 66 Ohio St.3d 458, 460-62 (1993); *Erie Cnty. Farmers' Ins. Co. v. Crecelius*, 122 Ohio St. 210 (1930)). Collier and Scott claim that, because the EBG Defendants' filing suit against Scott for extortion was merely retaliatory and not "aimed at resolving a legitimate legal dispute[,]"no privilege applies. (*Id.* at PAGEID 1759). Moreover, Collier and Scott assert, the EBG Defendants published their statements with actual malice, and the publication was not connected to any legitimate litigation purpose, defeating any

conditional privilege that may have applied. (*Id.*, citing *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council,* 73 Ohio St. 3d 1, 11-12 (1995)).

Collier and Scott claim that the Supreme Court of Ohio has held that, even if a lawsuit is technically properly filed, the litigation privilege will not apply if the suit was undertaken for an ulterior purpose that perverts the litigation process. (Doc. #93, PAGEID 1759-60, quoting *Yaklevich v. Kemp, Schaeffer & Rowe Co.,* 68 Ohio St. 3d 294, 298-99 (1994)). Here, Collier and Scott argue that because the extortion allegation against Scott was illegitimate and designed to harass or silence Collier and Scott with respect to Collier's whistleblower activity, and that, consequently, the litigation privilege does not apply. (*Id.* at PAGEID 1760, citing *Robb v. Chagrin Lagoons Yacht Club, Inc.,* 75 Ohio St.3d 264, 271)).

In Reply, the EBG Defendants argue that *Hecht* actually reinforces their position, as the Supreme Court of Ohio held in that case that the filing of a grievance against an attorney—a judicially-related filing that is not litigation—was covered by the absolute litigation privilege. (Doc. #97, PAGEID 1817-18, citing *Hecht*, 66 Ohio St. 3d 458 at paragraph two of syllabus)). Similarly, the EBG Defendants assert that in *Crecelius*, the Supreme Court of Ohio set forth the rule that has endured for nearly 100 years: that the absolute privilege applies even if the statements made in the course of litigation were "untrue, malicious, and not in good faith[.]" (*Id.* at PAGEID 1818 (internal quotation marks omitted), quoting *Crecelius*, 122 Ohio St at 214). Thus, the EBG Defendants claim, even assuming

14

*arguendo* that the statements they made in the Complaint, TRO Motion, and Motion to Disqualify were defamatory, they are not actionable. (*Id.* at PAGEID 1819, quoting *Crecelius*, 122 Ohio St. at 214-5). Finally, the EBG Defendants assert that *Yalkevich* and *Robb*, relied upon by Collier and Scott for the proposition that the litigation privilege does not extend to abuse of process claims, are inapposite, as they "say absolutely nothing about the litigation privilege." (*Id.* at PAGEID 1821). Accordingly, they conclude, "[a]pplication of the absolute litigation privilege defeats all of the claims against the EBG Third-Party Defendants." (*Id.*).

Further, the EBG Defendants point out fabrications by Collier and Scott as to two of the cases they cite in their memorandum *contra*: *Dart Indus. Co. v. Hurd*, and *State ex rel. Ellis v. Cleveland Mun. Sch. Dist.* (Doc. #97, PAGEID 1815, citing Doc. #93, PAGEID 1758; *Ellis*, 2015-Ohio-760; *Hurd*, 66 Ohio St. 2d 280 (1981)). EBG Defendants argue that *Hurd* is a fabrication, and *Ellis* is actually a federal district court case that "has nothing to do with demand letters, extortionate or otherwise." (Doc. #97, PAGEID 1815-16, citing *Ellis v. Cleveland Mun. Sch. Dist.*, 309 F. Supp. 2d 1019 (N.D. Ohio 2004)). As discussed in greater detail below, the Court's review confirms the EBG Defendants' representation of *Hurd* and *Ellis*.

The matters are now ripe for decision.

## II.   Legal Standards

### A.   Motion to Dismiss

Rule 8(a) provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The

complaint must provide the defendant with "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957).

Rule 12(b)(6) allows a party to move for dismissal of a complaint on the basis that it "fail[s] to state a claim upon which relief can be granted." The moving party "has the burden of showing that the opposing party has failed to adequately state a claim for relief." *DirecTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007), citing *Carver v. Bunch*, 946 F.2d 451, 454-55 (6th Cir. 1991). The purpose of a Rule 12(b)(6) motion to dismiss "is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true." *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993). In ruling on a Rule 12(b)(6) motion, the Court must "construe the complaint in the light most favorable to the plaintiff, accept its [well-pleaded] allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Handy-Clay v. City of Memphis*, 695 F.3d 531, 538 (6th Cir. 2012), quoting *Treesh*, 487 F.3d at 476.

Nevertheless, to survive a Rule 12(b)(6) motion, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Unless the facts alleged show that the plaintiff's claim crosses "the line from conceivable to plausible, [the] complaint must be dismissed." *Id*. Although this standard does not require "detailed factual allegations," it does require more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Id*. at 555. "Rule 8 . . . does not unlock the doors

16

of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). Legal conclusions "must be supported by well-pleaded factual allegations . . . [that] plausibly give rise to an entitlement of relief." *Id.* at 679. "Although for the purposes of this motion to dismiss we must take all the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

### B.    Litigation Privilege

"The litigation privilege provides absolute immunity to parties, witnesses, lawyers, and judges from future lawsuits for *statements* made during and relevant to judicial proceedings." *Reister*, 2020-Ohio-5484 at ¶ 8 (emphasis in original). The privilege is not limited to the four corners of filings, but also applies when "the allegedly defamatory statement bears some reasonable relation to the judicial proceeding in which it appears[.]" *Surace*, 25 Ohio St. 3d at 233.

The privilege, as initially set forth in *Crecelius* and clarified in *Surace*, addressed defamation claims. *Crecelius*, 122 Ohio St at 211-12; *Surace*, 25 Ohio St. 3d at 231. However, courts in Ohio have enforced the litigation privilege as an absolute defense to virtually every intentional tort when a statement is made in relation to a judicial proceeding. *See, e.g., Stewart v. Gentile*, 2025-Ohio-5012, ¶¶ 39-40, ___ N.E.3d ___, (7th Dist.) (malicious prosecution and abuse of process); *Schmidt v. Grossman Law Office*, 10th Dist. Franklin No. 14AP-127, 2014-Ohio-4227, ¶¶ 14-17 (Sept. 25, 2014) (abuse of process); *Harsh v. Franklin*, 2d Dist.

Montgomery No. 24331, 2011-Ohio-2428, ¶¶ 21-25 (May 20, 2011) (IIED, tortious

interference, fraud); *Seminatore v. Dukes*, 8th Dist. Cuyahoga No. 84032, 2004-

Ohio-6417, ¶¶ 37-40 (Dec. 2, 2004) (civil conspiracy). However, courts have

consistently rejected attempts to extend a blanket privilege to <u>federal</u> law claims.

*See, e.g., Steffes v. Stepan Co.*, 144 F.3d 1070, 1074 (7th Cir. 1990) (holding that

district court erred in extending Illinois absolute litigation privilege to employment

retaliation claim); *Novel v. Zapor*, No. 2:14-cv-264, 2015 WL 12734021, *11 (S.D.

Ohio Mar. 11, 2015) (Watson, J.), citing *Dowling v. Select Portfolio Servicing, Inc.*,

No. 2:05-CV-49, 2006 WL 571895, *8 (S.D. Ohio Mar. 7, 2006) (Smith, J.) (declining

to extend as a matter of law the litigation privilege to Civil RICO claims).

### C. Rule 11 Violations and Sanctions

Rule 11(b) dictates that:

By presenting to the court a pleading, written motion, or other
paper—whether by signing, filing, submitting, or later advocating it—
an attorney or unrepresented party certifies that to the best of the
person's knowledge, information, and belief, formed after an inquiry
reasonable under the circumstances:

(1) it is not being presented for any improper purpose, such as to
harass, cause unnecessary delay, or needlessly increase the cost of
litigation;

(2) the claims, defenses, and other legal contentions are warranted by
existing law or by a nonfrivolous argument for extending, modifying,
or reversing existing law or for establishing new law;

(3) the factual contentions have evidentiary support or, if specifically
so identified, will likely have evidentiary support after a reasonable
opportunity for further investigation or discovery; and

18

> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

FED.R.CIV.P. 11(b). While the Court has broad authority to impose sanctions when Rule 11(b) is violated, FED.R.CIV.P. 11(c), the Rule does not abrogate or limit the Court's inherent authority to impose sanctions. *See, e.g., Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991), citing *Roadway Exp. Inc. v. Piper*, 447 U.S. 752, 765 (1980); *Link v. Wabash R. Co.*, 370 U.S. 626, 632 (1962) ("As we recognized in *Roadway Express,* outright dismissal of a lawsuit, which we had upheld in *Link,* is a particularly severe sanction, yet is within the court's discretion.")).

> The imposition of sanctions in this instance transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself[.] . . .

> We discern no basis for holding that the sanctioning scheme of the statute and the rules displaces the inherent power to impose sanctions for the bad-faith conduct described above. These other mechanisms, taken alone or together, are not substitutes for the inherent power.

*Id.* at 46.

## III. Collier and Scott's Misconduct

At the outset, the Court must address the troubling accusations made by Kettering and the EBG Defendants: that Collier and Scott fabricated support for their arguments. (Doc. #97, PAGEID 1815-16 n.2, citing Memo. in Opp., Doc. #44, PAGEID 1213 n.6). The Court has reviewed the six cases aggregated by Kettering and the EBG Defendants and agrees that, whether due to intentional, bad-faith, or

reckless conduct by Scott and Hewitt, Collier and Scott made false representations

to the Court:

| Case Name and Citation | Collier and Scott's Proposition | Truth Regarding Case |
|---|---|---|
| *State v. Carter*, 72 Ohio App. 3d 553 (2d Dist. 1991) | A "wrongful threat" is an element of civil extortion under Ohio law. (Motion to Dismiss, Doc. #13, PAGEID 508). | Case cite links to *Stull v. Combustion Eng'g, Inc.* (3d Dist. 1991), a wrongful termination case. A Westlaw search revealed no case captioned *State v. Carter* from the Second District in 1991, and no case with that caption addressing the elements of extortion. |
| *State v. Milam*, 2022-Ohio-3965 (10th Dist.) (no date provided by Scott and Collier) | "Intent to obtain value or coerce" is an element of civil extortion. (*Id.*). | Case cite links to *State v. Eddy*, 3d Dist. Allen No. 1-22-17 (Nov. 7, 2022), a domestic violence case. A Westlaw search revealed no case captioned *State v. Milam* from the Tenth District in any year. Nor did it reveal a case with that caption addressing extortion. |
| *Kenty v. TransAmerica Premium Ins. Co.*, 72 Ohio St. 3d 415, 419 (1995) | Settlement "demands made without a good-faith basis" are actionable in civil extortion. (*Id.*). | *Kenty* addresses the cognizability of tortious interference with contract under Ohio law, and a claim of civil conspiracy to conceal payments made under an insurance policy. 72 Ohio St. 3d at 418-19. No demands, threats, or claims of extortion were at issue. |
| *United States v. Pendergraft*, 297 F.3d 1198 (11th Cir. 2002) | Standard for damages for civil extortion under Ohio law. (*Id.*). | *Pendergraft* addressed criminal attempted extortion under the federal Hobbs Act of 1946. 297 F.3d at 1200, citing 18 U.S.C. § (continued next page) |

| | | 1951. The alleged extortion took place in Florida, *id.*, and Ohio law was never addressed. |
|---|---|---|
| *State ex rel. Ellis v. Cleveland Mun. Sch. Dist.*, 2015-Ohio-760 (no district cited) | Settlement demand letter was a protected, non-actionable communication. (Doc. #93, PAGEID 1758). | Case cite is to two orders from the Supreme Court of Ohio, one granting *pro hac vice* admission to attorneys, and one dismissing an appeal for failure to prosecute. <br><br> There is a case captioned *Ellis v. Cleveland Mun. Sch. Dist.* in the United States District Court for the Northern District of Ohio. <br><br> 309 F. Supp. 2d 1019 (N.D. Ohio 2004). However, as pointed out by the EBG Defendants (Doc. #97, PAGEID 1815), that case addressed whether certain records were protected under the Federal Education Rights and Privacy Act of 1974, 20 U.S.C. § 1232g. *Ellis*, 309 F. Supp. 2d at 1021. The records request arose out of alleged corporal punishment by a substitute teacher. *Id.* at 1022-23. No language akin to the one described by Collier and Scott was at issue. |
| *Dart Indus. Co. v. Hurd*, 66 Ohio St. 2d 280 (1981) | Settlement demand letter was a protected, non-actionable communication. (*Id.*). | Case cite links to *State ex rel. Voss v. Northwest Local Bd. of Educ.*, addressing the right of a teacher to a continuing contract. 66 Ohio St. 2d 274, 280 (1981) (Holmes, J., concurring). A Westlaw search did not reveal any case with that caption. |

As discussed in greater detail below, the volume, extent, and repetitive nature of fabrications by Scott and Hewitt are without parallel in the undersigned's tenure as a trial judge. Kettering and the EBG Defendants brought these cases to the attention of the Court—and to the attention of Scott and Hewitt—not in passing, but in a footnote that occupied more than one-third of one page, single-spaced (Doc. #44, PAGEID 1213 n.6) and two full pages in the EBG Defendants' Reply. (Doc. #97, PAGEID 1815-16). Yet, neither Scott nor Hewitt has acknowledged the misrepresentations, much less attempted to explain why they subsequently inserted them into multiple filings.

The Court expresses its appreciation for Kettering and the EBG Defendants bringing these misrepresentations to the Court's attention. However, in reading their memoranda, the Court feared that those parties had only scratched the surface of counsel's bad faith. The Court's further review of Collier and Scott's Motion and Reply memorandum proved its fears correct:

| Case Name and Citation | Collier and Scott's Proposition | Truth Regarding Case |
|---|---|---|
| *United States v. Jackson*, 180 F.3d 55, 70 (2d Cir. 1999) | "Informing a party that you will report their misconduct to appropriate authorities if corrective action is not taken does not constitute an unlawful threat" (Motion to Dismiss, Doc. #13, PAGEID 509, quoting *Jackson*). | Quoted or similar language does not appear in the opinion. Nor would such language have appeared, as the case addressed the defendant's threat to publicize her story that she was fathered out-of-wedlock by a celebrity unless that celebrity paid her $40 million. *Jackson*, 180 F.3d at 59. |

22

| | | |
|---|---|---|
| *Flatley v. Mauro*, 39 Cal.4th 299, 331 (2006) | "Seeking a monetary settlement tied directly to legal claims does not become extortion merely because regulatory reporting is also contemplated". (*Id.*, quoting *Flatley*). | Quoted or similar language does not appear in the opinion. Nor would such language have appeared, as the extortion attempt in *Flatley* dealt with publication of a rape allegation. *Flatley*, 39 Cal.4th at 305-06. |
| *Kenty*, 72 Ohio St. 3d at 419 (1995)<br><br>*Pendergraft*, 297 F.3d at 1205 | "Where claims are based on enforceable legal rights, settlement demands are privileged." (*Id.* at PAGEID 510, quoting *Kenty*.<br><br>"Advising of possible consequences from lawful reporting cannot form the basis of an extortion claim." (*Id.*, quoting *Pendergraft*). | As discussed *supra*, *Kenty* and *Pendergraft* do not concern civil extortion; nor do they stand for the propositions asserted by Collier and Scott. However, the Court again must note that nothing resembling the purported language quoted by Collier and Scott appears in either case. |
| *Off. Depot, Inc. v. Impact Off. Prods., LLC*, 821 F. Supp. 2d 912, 919-23 (N.D. Ohio 2011) | DTSA and OUTSA claims must be pleaded with particularity. (*Id.* at PAGEID 512; Doc. #69, PAGEID 1436). | The cited portions of *Office Depot* address the extent to which the DTSA and OUTSA preempt common-law tort claims. 821 F. Supp. 2d at 919-23. The case does not address whether a plaintiff must plead misappropriation with particularity. FED.R.CIV.P. 9(b).<br><br>Kettering made Collier and Scott aware of this error (Doc. #44, PAGEID 1218 n.9), but Collier and Scott chose to renew their argument *unaltered* in the Reply. |
| *In re Protech Indus.*, 51 F.4th 714, 720-22 (6th Cir. 2022) | For DTSA and OUTSA claims, plaintiff must adequately plead the (continued next page) | Collier and Scott's citation is encompassed by *United States v. Harris*, which deals with (continued next page) |

| | reasonable security measures it undertook to protect its confidential information. (*Id.*; Doc. #69, PAGEID 1436). | alleged inconsistencies between the sentence imposed orally at sentencing and what was reduced to written judgment. 51 F.4th 705, 719-22 (7th Cir. 2022). A Westlaw search did not reveal any case entitled *In re Protech* in the Sixth Circuit under any date. The only case with a similar caption is from the United States Bankruptcy Court for the Middle District of Florida. *In re Protech Coating Servs., Inc.*, 479 B.R. 611 (M.D. Fla. 2012). Kettering made Collier and Scott aware that *Protech* did not exist. (Doc. #44, PAGEID 1220 n.10). However, Collier and Scott again attempted to rely on this phantom case in their Reply. |
|---|---|---|
| *Wilson v. Collins*, 517 F.3d 421, 429 (6th Cir. 2008) | HIPAA does not provide a private right of action. (*Id.*). | *Wilson* addressed whether taking DNA specimens from prisoners violated the Fourth, Fifth, and Fourteenth Amendments. 517 F.3d at 424. The case did not address HIPAA or non-civil rights civil litigation in general. |
| *Jackson*, 180 F.3d at 70. | Informing proper regulatory authorities of misconduct is not an actionable threat; rather, it is lawful whistleblowing activity. (Doc. #69, PAGEID 1434-35). | While Kettering made Collier and Scott aware that *Jackson* did not stand for this proposition. (Doc. #44, PAGEID 1215 n.7), Collier and Scott renewed their reliance on the case in their Reply. |
| *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg.*, 511 F. App'x | DTSA and OUTSA claims, along with breach of contract (continued next page) | While *Allied Erecting* is an OUTSA misappropriation case, the portion cited by Collier and (continued next page) |

| 398, 405 (6th Cir. 2013)). | claim, are not viable when the plaintiff did not have ownership or control of the confidential information. (*Id.* at PAGEID 1435, 1441). | Scott addresses plaintiff's post-jury verdict request for injunctive relief. 511 F. App'x at 405. Ownership and control of information do not appear to have been at issue on appeal. |
|---|---|---|

The above are not mere scrivener's errors or the confusing of the holding of a case with *dictum*. They are not even engaging in such misreading of the decision that they fail to recognize that the case stands for a proposition diametrically opposed to the one they are asserting. Rather, Scott and Hewitt have cited at least twelve cases that either do not exist or are so far afield from the subject matter of the captioned case that they should have reasonably realized that they had no place in a Court filing, in this or in any other case. Incredibly, even after being put on notice by Kettering that three cases cited in Collier and Scott's Motion did not state what Collier and Scott represented that they did, Collier and Scott cited those very same cases for the very same propositions of law in their later Reply.

Notably, despite being aware since September 15, 2025, that Kettering is accusing her of fabricating caselaw (Doc. #44), and despite voluminous motion practice and numerous telephonic conferences since then, Scott has never addressed the allegation. Nor has Hewitt, despite being on notice for more than a month that the EBG Defendants were indirectly accusing *him* of fabricating cases by co-signing the memorandum *contra*. (Doc. #97, PAGEID 1815-16). By failing to

do so, Scott and Hewitt have compounded their errors by neglecting their ongoing, affirmative duty of candor to the Court. *See* OHIO R. PROF. COND. 3.3(a)(1) (emphasis in original) ("A lawyer shall not *knowingly* . . . fail to correct a false statement of material fact or law previously made to the *tribunal* by the lawyer[.]"). Even though there is no colorable argument that the above citations are in any way accurate, Scott and Hewitt were still obligated to acknowledge their transgressions to the Court. Scott's conduct is particularly egregious, given that, after being caught red-handed, she doubled down and *again* fabricated many of the same citations. Whether singly or in the aggregate, Scott and Hewitt's actions and lack of accountability defy explanation.

As the EBG Defendants note (Doc. #97, PAGEID 1816), the increased prevalence of generative artificial intelligence ("AI") "has affected court filings," and "it has become well established that many harms flow from the submission of fake opinions." *Johnson v. Dunn*, 792 F. Supp. 3d 1241, 1256 (S.D. Ala. 2025) (brackets, internal quotation and citation omitted) (collecting cases). The Court does not know whether Scott and Hewitt used AI to generate caselaw in support of their arguments, and whether counsel did so is ultimately unimportant. What is important is that Scott and Hewitt violated their duty of candor and their duty to represent to the Court that, in any filing, "the claims, defenses, and other legal contentions are warranted by existing law[.]" FED.R.CIV.P. 11(b)(2). Counsel's filings constitute nothing less than the subjective bad faith necessary for counsel to be sanctioned. *See, e.g., Johnson*, 792 F. Supp. 3d at 1265 (lead attorney's

failure to check filing that contained phantom citations was "more than mere recklessness and [was] tantamount to bad faith."); *United States v. Hayes*, 763 F. Supp. 3d 1054, 1071 (E.D. Cal. 2025) (internal quotation marks and citation omitted), *reconsideration denied at* No. 2:24-cr-280-DJC, 2025 WL 1067323 (E.D. Cal. Apr. 9, 2025) (attorney's conduct constituted bad faith because "[s]ubmitting fictitious cases and quotations to the Court . . . degrades or impugns the integrity of the Court and interferes with the administration of justice[.]"). Indeed, despite having served continuously as a trial judge since 1969, the undersigned cannot recall a comparable instance of such brazen and repeated dishonesty.

"If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." FED.R.CIV.P. 11(c)(1). Moreover, as discussed above, the Court has plenary authority, not dependent upon Rule 11(c), to impose sanctions. *Chambers*, 501 U.S. at 45-46. The Supreme Court has repeatedly stated that a trial court's dismissal of a suit with prejudice for failure to prosecute is a proper, albeit severe, exercise of its inherent power to police itself. *Roadway Exp.*, 447 U.S. at 765, quoting *Link*, 370 U.S. at 630. Since the overruling of a motion to dismiss is a far less severe sanction than, *e.g.*, *sua sponte* dismissing Scott and Collier's Counterclaim and Third-Party Complaint with prejudice, overruling Scott and Collier's Motion is well within the Court's authority. *Id.* The Court is mindful that "inherent powers . . . be exercised with restraint and

27

discretion." *Id.* at 764. However, given the repeated fabrications and misrepresentations by counsel, and Scott and Collier's Motion being largely based on those fabrications and misrepresentations, the Court, at this point, cannot conceive of a lesser or narrower sanction that would adequately address counsel's misconduct.

The Court has been patient and understanding with the parties, but especially with Collier and Scott's counsel, throughout this litigation. Most notably, the Court declined to sanction Scott when, on September 8, 2025, in open court, she accused the undersigned's staff of engaging in *ex parte* communication with counsel for Kettering. (Tr., Doc. #31, PAGEID 1100-02). However, Collier and Scott's filings have led to the Court completely losing trust in Scott and Hewitt. To allow counsel's representation to continue, moving forward, would require everyone involved in this case to verify not only that the cases cited by Collier and Scott stand for the propositions cited, but, indeed, whether the cases exist at all and have any relevance whatsoever to the argument Collier and Scott are making. The Court will not impose such a burden on both opposing parties and itself. Perhaps Scott and Hewitt, or new counsel representing Collier and Scott, can establish and maintain the successor Judge's trust. However, given the Court's intent to refer Scott and Hewitt for disciplinary proceedings, that trust cannot be rebuilt with the undersigned.

For these reasons, Scott and Hewitt are ordered to show cause within FOURTEEN (14) days of entry: (1) why their conduct did not violate Rule 11(b); (2)

why they should not be held in contempt of Court; and (3) why this Court should

not impose sanctions, including but not limited to overruling Scott and Collier's

Motion to Dismiss (Doc. #13) with prejudice. No ruling is made at this time on

that motion. Upon resolution of the show cause order, the Court will refer Scott

and Hewitt for disciplinary proceedings.

## IV.   EBG Defendants' Motion to Dismiss (Doc. #91)

### A.   State Law Claims

Collier and Scott concede in their memorandum *contra* that the gravamen

of their claims is the EBG Defendants "filing retaliatory pleadings to engineer

disqualification and undermine whistleblower protection[.]" (Doc. #93, PAGEID

1760). Neither in their memorandum—nor, more importantly, in their Amended

Third-Party Complaint—do they plausibly allege that the EBG Defendants

undertook any actions against them outside of: (1) their filings in the captioned

case, and (2) contemporaneous or subsequent statements made in connection

with those filings. Rather, they allege that upon receipt of the letter, "Kettering

retained [EBG], notifying Plaintiffs of representation on July 30, 2025[,]" (Doc. #28,

PAGEID 1058, ¶ 20), just fourteen days before the EBG Defendants undertook their

first involvement in the dispute—filing the Complaint and TRO Motion. In other

words, the EBG Defendants' alleged harm to Collier and Scott only began with the

filings on August 13, 2025, and only continued in proceedings relating to the

instant case. Thus, even assuming *arguendo* as true Scott and Collier's argument

that the privilege "does not extend to . . .bad-faith 'pre-litigation' communications

29

unconnected to a legitimate claim" (*id.* at PAGEID 1758), the privilege still covers all conduct of which the EBG Defendants are accused.

Consequently, the litigation privilege is an absolute bar with respect to Collier and Scott's state-law claims of false light (Claim Five), abuse of process (Claim Six), malicious prosecution (Claim Seven), IIED (Claim Eight), and civil conspiracy (Claim Nine), because those claims may not, under any circumstances, be successful based on statements made during the course of litigation. *Reister*, 2020-Ohio-5484, ¶ 8; *see also supra* Section II.B (collecting cases showing that the litigation privilege applies to each of Collier and Scott's state-law claims). Accordingly, the Motion is sustained as to Collier and Scott's state law claims, Claims Five through Nine, and they are dismissed with prejudice as against the EBG Defendants.

### B.  Federal Law Claims

As discussed in Section II.B, the state law absolute litigation privilege does not extend to employment retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Claim Three).[5] *Steffes*, 144 F.3d at 1074. However, while Title VII is not to be read so narrowly as to encompass only a formal employer-employee relationship, *Christopher v. Stouder Mem. Hosp.*, 936

---

[5] In the Amended Third-Party Complaint, Scott and Collier state that "[t]his claim arises under Title VII . . . and Ohio Rev. Code § 4112.02(I)[.]"  (Doc. #28, PAGEID 1066, ¶ 50).  However, in their memorandum *contra*, they state that Collier's claim arises under Title I of the Americans with Disabilities Act of 1990.  (Doc. #93, PAGEID 1762, citing 42 U.S.C. § 12203(a)(1)).  Any such distinction is immaterial for the purposes of the Motion; "the ADA adopts Title VII's remedial framework for employment-related claims," *Post v. Trinity Health-Mich.*, 44 F.4th 572, 581 (6th Cir. 2022), meaning that the "control of employment" element in Title VII cases applies with equal force in an ADA employment case.

F.2d 870, 874-75 (6th Cir. 1991) (collecting cases), for a retaliation claim to be actionable against a defendant that is not a direct employer, as herein, the defendant must be able to exercise such control over the plaintiff's employment that plaintiff could plausibly "have alleged some type of joint-employer theory against" the defendant. *Post v. Trinity Health-Mich.*, 44 F.4th 572, 579 (6th Cir. 2022); *see also Christopher*, 936 F.2d at 875, citing *Sibley Mem. Hosp. v. Wilson*, 488 F.2d 1338, 1341 (D.C. Cir. 1971) ("[I]n certain circumstances, control over access to employment may reside in organizations outside the regular employer-employee relationship.").

Collier and Scott have not alleged facts that would permit the reasonable inference that the EBG Defendants, acting only as counsel for Kettering, were in any position to interfere with Collier's current or future employment, much less were functioning as Collier's "joint employer" with Kettering. Further, Collier and Scott do not cite any caselaw, and the Court is unaware of any, suggesting that outside counsel merely filing a lawsuit and TRO Motion on behalf of their client, without more, can subject *counsel* to a retaliation claim simply because their filing was preceded by protected activity by the client's employee. Absent any factual or legal support, Claim Three is not actionable under federal or Ohio law, *see Ulner v. Dana Corp.*, 200 F. Supp. 2d 804, 818 (N.D. Ohio 2002) ("Ohio courts apply the Title VII framework to state law employment discrimination claims"), and the EBG Defendants' Motion must be sustained as to that claim.

31

As to Collier and Scott's sole remaining claim, Civil RICO (Claim Ten), "[t]o proceed beyond a motion to dismiss on a Civil RICO claim, a plaintiff must plausibly allege, *as to each defendant*, that the defendant: (i) conducted, (ii) an enterprise, (iii) through a pattern (i.e., two or more acts), of (iv) racketeering activity[.]" *Compound Prop. Mgmt., LLC v. Build Realty, Inc.*, 462 F. Supp. 3d 839, 855 (S.D. Ohio 2020) (Cole, J.) (emphasis added), citing *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 483 (6th Cir. 2013). Further, "a plaintiff must allege an injury to his business or property by reason of the RICO violation." *Smith v. Lerner, Sampson & Rothfuss, L.P.A.*, 658 F. App'x 268, 278 (6th Cir. 2016) (internal quotation marks and citation omitted). Moreover, 18 U.S.C. § 1964(c), the remedies provision for Civil RICO, "does not allow recovery for all harms. Instead, by explicitly permitting recovery for harms to business and property, it implicitly excludes recovery for harm to one's person." *Med. Marijuana, Inc. v. Horn*, 604 U.S. 593, 601 (2025).

To know this much is to resolve the claim as a matter of law. Scott's allegations of harm consist of: "reputational harm, emotional distress, and litigation-related damages" and jointly incurring with Collier "substantial litigation expenses defending against baseless claims." (Doc. #28, PAGEID 1077, ¶ 88). Emotional distress and litigation costs and damages are textbook personal injuries, and a vague allegation of "reputational harm" is insufficient for the Court to infer that Scott's law practice was concretely harmed as a direct and proximate result of the extortion claim filed against her—again, the only racketeering activity

32

of which the EBG Defendants are potentially accused. *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."). Collier's claims of "reputational harm, physical and emotional distress, and financial losses" (Doc. #28, PAGEID 1077, ¶ 88), are similarly not actionable. While Collier's allegation of "retaliatory termination" (*id.*) may not have been explicitly foreclosed by *Horn*, 604 U.S. at 614, it does fail against the EBG Defendants, because Collier does not allege that the EBG Defendants played any part in the decision to terminate her. Absent a concrete, cognizable injury from the EBG Defendants' participation in a criminal enterprise, Collier and Scott do not have a colorable Civil RICO claim.

Moreover, even if their alleged harms were to come within the scope of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964(c), Collier and Scott still have failed to plead a plausible claim. Collier and Scott allege that the EBG Defendants were part of a criminal enterprise with Kettering and its individual employees "because they functioned as a continuing unit to further unlawful objectives." (Doc. #28, PAGEID 1076, ¶ 85, citing 18 U.S.C. § 1961(4)). However, without more, the allegation is a mere legal conclusion to which no presumption of truth attaches. *Twombly*, 550 U.S. at 555. As to the EBG Defendants, there is nothing more. The criminal activities complained of by Collier and Scott are essentially: committing fraud in clinical trials, concealing HIPAA, retaliating against Collier "in violation of federal statutes, including HIPAA,

Civil Rights, and False Claims Act frameworks", and concealing "systematic noncompliance" and the consequent risk to patient safety. (Doc. #28, PAGEID 1077, ¶ 86). These are all actions that were allegedly undertaken by the Kettering Defendants, with no allegation of involvement by the EBG Defendants. The only theoretical allegation of racketeering activity against the EBG Defendants is that they, on behalf of Kettering, filed suit against Collier and Scott in furtherance of Kettering's retaliation. (*Id.*). By definition, a single act cannot constitute a pattern of racketeering activity. *In re ClassicStar Mare Lease Litig.*, 727 F.3d at 483, citing 18 U.S.C. § 1962(c). Consequently, Claim Ten must be dismissed as to the EBG Defendants.

For the reasons set forth above, EBG Defendants' Motion to Dismiss (Doc. #91) is SUSTAINED for Collier and Scott's failure to state claims upon which relief can be granted.

## V.   Conclusion

For the foregoing reasons, Collier and Scott's Motion to Dismiss (Doc. #13) is not ruled upon at this time, and the EBG Defendants' Motion to Dismiss (Doc. #91) is SUSTAINED. Collier and Scott's First Amended Counterclaim (Doc. #28) is DISMISSED WITH PREJUDICE as against the EBG Defendants. Judgment shall ultimately so enter in favor of the EBG Defendants and against Collier and Scott. Scott and Hewitt are ORDERED TO SHOW CAUSE within FOURTEEN (14) days of entry why: (1) their conduct did not violate Rule 11(b); (2) they should not be held in contempt of this Court; and (3) this Court should not impose sanctions against

both counsel and the parties, including but not limited to overruling with prejudice Collier and Scott's Motion to Dismiss (Doc. #13).

Upon resolution of the Show Cause Order, the undersigned intends to recuse himself from further proceedings in this litigation and to report Scott and Hewitt to the Cincinnati Bar Association Grievance Committee or the Supreme Court of Ohio Office of Disciplinary Counsel. The District Judge to whom the matter is reassigned will adjudicate the Motions to Dismiss of Kettering (Doc. #73) and that of the Individual Defendants. (Doc. #93). Likewise, should Collier and Scott's Motion to Dismiss (Doc. #13) remain viable, same will be decided by the undersigned's successor as District Judge.

The Court takes no pleasure in directing counsel to show cause why they should not be held in violation of Fed.R.Civ.P. 11(b) or in contempt of this Court and, further, advising counsel that this Court will refer their conduct to the relevant ethics committee or to the Supreme Court of Ohio Office of Disciplinary Counsel. This is particularly so, given that the Court has acted *sua sponte*, without any motion by opposing counsel. Indeed, in 56 years as a judicial officer, this is the very first time the Court has ever had occasion to do so. In the very few situations similar to, but far less egregious than Scott and Hewitt's conduct, once opposing counsel has pointed out such misconduct, or even without such impetus, the offending counsel has reached out immediately, either in writing or in a personal visit to the Court (along with opposing counsel), in order to

35

apologize to the Court and, often, to explain. Yet, no apology or attempted explanation occurred in this matter.

One might understand and excuse a citation containing an incorrect date, or presenting *dicta* as the holding of a given case. However, Scott and Hewitt's actions in this matter, unexplained and unapologized for, in spite of their conduct twice having been brought to their attention by opposing counsel, *in the aggregate*, as opposed to a single situation involving a single case, is nothing less than a breach of the duty of candor, honesty, and trust that, if it is allowed to become the norm, threatens the very foundation of our legal system and the rule of law.

IT IS SO ORDERED.

January 2, 2026

WALTER H. RICE, JUDGE
UNITED STATES DISTRICT COURT

36