**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| KETTERING ADVENTIST HEALTHCARE, | : | Case No. 3:25-cv-273 |
| | : | |
| | : | |
| Plaintiff, | : | Judge Walter H. Rice |
| | : | Magistrate Judge Peter B. Silvain, Jr. |
| vs. | : | |
| | : | |
| SANDRA COLLIER, *et al.*, | : | **FILED UNDER SEAL** |
| | : | |
| Defendants. | : | |

**ORDER**

This matter is before the Court *sua sponte* following a review of the conduct of Defendant Mary T. Scott, Esq., on her own behalf, and H. Leon Hewitt, Esq., who represents Defendant Sandra Collier, in connection with a scheduled court mediation before the undersigned. For the reasons set out herein, the undersigned has determined that attorney misconduct has occurred that violates the applicable court rules and ethical obligations of these attorneys. Based on these attorneys' conduct, the undersigned is compelled to decline to conduct further mediation proceedings in this matter and refers this case back to the assigned District Judge for further action as the Court deems appropriate.

## I.      **Procedural History**

On November 20, 2025, District Judge Walter H. Rice ordered the parties to appear before the undersigned to participate in court-conducted mediation. (Doc. #98). Mediation was scheduled to take place on January 28, 2026, via Zoom. (Doc. #99).

On January 2, 2026, the Judge Rice issued a Decision and Entry cataloging "troubling accusations … that Collier and Scott fabricated support for their arguments." (Doc. #113, *PageID* #2020) (citing Doc. #s 44, 97; *PageID* #s 1213, 1815–16). In addressing these accusations, the Court reviewed a number of cases that Defendants cited to as support for their arguments and found that Defendants Collier and Scott had falsely represented numerous cases. *Id.* at 2020–26. Notably, the Court also stated that "the volume, extent, and repetitive nature of fabrications by Scott and Hewitt are without parallel in the undersigned's tenure as a trial judge[,]" further finding that the unearthed misrepresentations went beyond "mere scrivener's errors or confusing the holding of a case with *dictum*." *Id.* at 2023, 2026. The Court ordered Scott and Hewitt to show cause as to why their conduct did not violate Rule 11(b), why they should not be held in contempt of Court, and why the Court should not impose sanctions against both counsel and parties. *Id.* at 2035–36.

Defendant Scott filed a response to the Order to Show Cause on January 15, 2026. (Doc. #114). Defendant Scott indicated the "citation deficiencies" were the result of "AI-assisted research tools" she relied upon without independently verifying the sources. *Id.* at 2039. Defendant Scott further explained that, when counsel for Plaintiff raised concerns regarding the accuracy of the cited authority, she failed to "pause, reassess, and independently verify the authority before filing again...." *Id.* Defendant Scott asserted that she had implemented several "corrective safeguards" to ensure similar misrepresentations do not occur in the future— including mandating independent verification of all cited authority, discontinuing the use of AI tools for legal research identification, consulting with mentor counsel on ethical obligations and citation protocol, and engaging additional litigation counsel for independent review. *Id.* at 2040.

Attorney Hewitt likewise filed a response to the Order to Show Cause on January 18,

2026. (Doc. #117). Attorney Hewitt indicated that Defendant Scott undertook "legal research, citation selection, and drafting decisions" prior to his appearance on this case; however, after Attorney Hewitt made his appearance, he stated that he "reasonably relied" on Defendant Scott's cited authority. *Id.* at 2047 ("At no point did I independently generate, fabricate, or misrepresent any legal authority to the Court."). Attorney Hewitt stated he signed implicated filings "in reliance on the express assurances regarding the integrity of the cited law given to me by Attorney Scott." *Id.* Like Defendant Scott, Attorney Hewitt listed a number of safeguards he implemented to ensure accurate filings in the future, including mandating the use of authoritative sources, independently verifying cited case law prior to filing, and engaging additional litigators for independent review. *Id.*

Despite these explanations and assurances of reformed conduct, only a few days later on January 21, 2026, ahead of the January 28, 2026 mediation, Attorneys Hewitt and Scott submitted mediation statements with many patent misstatements and mischaracterizations of the law. Based on this misconduct, on January 27, 2026, the undersigned cancelled the scheduled mediation.

## II.     Confidentiality of Mediation Statements

While mediation statements are generally confidential, they may be disclosed according to a handful of exceptions. S.D. Ohio Civ. R. 16.3(c). This includes when "[a] Judge assigned to the case determines that such disclosure is needed in connection with possible sanctions for misconduct relating to the ADR proceeding." S.D. Ohio Civ. R. 16.3(c)(3)(C). The undersigned finds that this exception applies in the instant matter. However, with recognition of the sensitive nature of the mediation proceedings, the undersigned directs that this Order be filed under seal.

3

**III.** **Discussion**

    **a.** **Attorney Hewitt's Mediation Statement**

Upon an initial review of Attorney Hewitt's Meditation Statement, the undersigned discovered several discrepancies regarding Attorney Hewitt's assertions and the cited authority. For ease of reference, the undersigned has classified these discrepancies under three broad categories: unidentifiable authority, unrelated authority, and misstated authority.

    *i.* *Unidentifiable Authority*

In his representation of Defendant Collier, Attorney Hewitt cites to two cases that cannot be found. First, Attorney Hewitt avers that "[i]nformation that is routinely disclosed to third parties or shared in the ordinary course of regulated business does not derive independent economic value from secrecy and cannot qualify as a trade secret," citing to "*Valco Cincinnati, Inc. v. N & D Machining Serv., Inc.*, 492 F. App'x 564, 571–72 (6th Cir. 2012)."[1] (Hewitt Med. Stmt. at 7). Attorney Hewitt uses the same authority to contend that "[h]ospital clinical research records—protocols, compliance materials, monitoring documents, and correspondence—are created for regulatory compliance and are routinely shared with sponsors, CROs, IRBs, auditors, and regulators. Such routine dissemination defeats secrecy as a matter of law." *Id.* Although there is a case named *Valco Cincinnati, Inc. v. N & D Machining Serv., Inc.*, it was published in 1986 in a different reporter by the Supreme Court of Ohio. *See Valco Cincinnati, Inc. v. N & D Machining Service, Inc.*, 24 Ohio St. 3d 41 (1986). Even assuming this is the case Attorney Hewitt meant to cite to, while the court discusses what constitutes a trade secret and the

---

[1] In support of this assertion, Attorney Hewitt also cites to *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 410-11 (6th Cir. 2006). This case will be discussed in further detail below.

measures a manufacturer takes to insure the security of trade secrets, it does not discuss independent economic value nor does it discuss routine disclosure to sponsors, CROs, IRBs, auditors, and regulators.  *See id*.  Furthermore, the citation used by Attorney Hewitt (492 F. App'x 564) does identify a case decided the by Sixth Circuit in 2012; however, this case discusses the Employee Retirement Income Security Act of 1974 (ERISA) and is unrelated to Attorney Hewitt's arguments. See *Walker v. Fed. Express Corp.*, 492 F. App'x. 559 (6th Cir. 2012).

Second, Attorney Hewitt cites to "*Fulks v. Griffith*, 100 Ohio App. 213, 215–16 (Ohio Ct. App. 1955)."  (Hewitt Med. Stmt. at 8).  A search using this citation produces a case by the name of *Lewis v. Akerberg*; however, *Lewis* discusses the conveyance of real property and is unrelated to the instant case.  *See* 100 Ohio App. 209 (10th Dist. 1954).  The case cited by Attorney Hewitt does not exist and appears to be a "hallucination" of legal authority presented by this attorney to the Court.

### ii.     Unrelated Authority

Next, Attorney Hewitt cites to authority that is completely unrelated to his relevant assertions.  For example, Attorney Hewitt argues that "Ohio courts generally do not recognize conversion of intangible information or data absent deprivation of tangible property," citing to *Dice v. White Family Cos., Inc*., 173 Ohio App.3d 472, 478–79 (Ohio Ct. App. 2007).  (Hewitt Med. Stmt. at 8).  Although the court in *Dice* discusses conversion—specifically conversion of cash—the court does not touch on whether property must be tangible or intangible nor does it discuss information or data.  *Dice*, 173 Ohio App. 3d at 477-81.  Further, Attorney Hewitt avers that "[r]etention or copying of information, without deprivation of possession, does not constitute

conversion," citing *Stolle Mach. Co., LLC v. RAM Precision Indus*., 605 F. App'x 473, 488 (6th Cir. 2015). (Hewitt Med. Stmt. at 8). While *Stolle* does discuss copying protected material for purposes of copyright infringement, the court does not discuss mere retention or copying of information in relation to conversion. Indeed, the Sixth Circuit notes that that the District Court dismissed the conversion claim. *Stolle Mach.*, 605 F. App'x at 478. Finally, Attorney Hewitt contents that "[c]ivil conspiracy may be inferred from concerted action and common purpose where underlying torts are plausibly pleaded" and cites to "*Williams*, 83 Ohio St.3d at 475" and "*Plain Dealer*, 80 Ohio St.3d at 525." (Hewitt Med. Stmt. at 12). While a slight stretch of the case law, Attorney Hewitt's cite to *Williams* is generally reasonable. *See Williams v. Aetna Fin. Co.*, 1998-Ohio-294, 83 Ohio St. 3d 464, 475, 700 N.E.2d 859, 868. However, the court in *Plain Dealer* does not discuss civil conspiracy; *Plain Dealer* specifically examines disclosure under the Ohio Public Records Act, as well as the protection of trade secrets. *State ex rel. The Plain Dealer v. Ohio Dep't of Ins.*, 1997-Ohio-75, 80 Ohio St. 3d 513, 687 N.E.2d 661.

### iii. *Misstated Authority*

Finally, regarding improperly misstated case law, Attorney Hewitt cites to authority in a manner that exaggerates or misapplies the law throughout his meditation statement. Attorney Hewitt first states that:

> To state a claim for trade secret misappropriation under the DTSA and Ohio UTSA, a plaintiff must plausibly allege: (1) the existence of a trade secret; (2) ownership or lawful control of that trade secret; (3) misappropriation by improper means or unauthorized use; and (4) resulting damages. Failure to plead any element is fatal.

(Hewitt Med. Stmt. at 7). Attorney Hewitt cites to *Stolle Mach. Co., LLC v. RAM Precision*

*Indus.*, 605 F. App'x 473, 485–86 (6th Cir. 2015). *Id.* However, *Stolle Mach. Co.* does not discuss the Defend Trade Secrets Act (DTSA). *See Stolle Mach. Co.*, 605 F. App'x 473. While the Ohio Uniform Trade Secrets Act (OUTSA) is discussed throughout the opinion, the elements outlined in Attorney Hewitt's statement do not appear. *Id.* The court instead defines misappropriation as follows:

> (1) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; (2) disclosure or use of a trade secret of another without the express or implied consent of the other person by a person who did any of the following: (a) used improper means to acquire knowledge of the trade secret; (b) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret that the person acquired was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; (c) before a material change of their position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

*Id.* at 481-82. Attorney Hewitt's pin cite reflects *Stolle Mach. Co.*'s treatment of the elements of tortious interference with business relationships, not misappropriation of trade secrets, and lists the elements as "(1) the existence of a business relationship, (2) the wrongdoer's knowledge of the relationship, (3) the wrongdoer's intentional and material interference with the business relationship, (4) lack of justification, and (5) damages." *Id.* at 485–86. While the second part of his assertion—"[f]ailure to plead any element is fatal"—is not expressly stated, it can be inferred from the elements listed in the assertion and the use of the word "and." However, as discussed above, the elements listed by Attorney Hewitt do not appear in the cited case.

Attorney Hewitt cites to *Stole Mach. Co.* again later in his mediation statement in relation to trade secret misappropriation, asserting that "[a]uthorized access within the scope of

employment, absent circumvention or competitive misuse, does not constitute misappropriation," citing specifically to page 486. (Hewitt Med. Stmt. at 8). While the *Stolle Mach. Co.* court does discuss misappropriation by improper means, Attorney Hewitt's assertion stretches the bounds of the court's findings. *See Stolle Mach. Co.*, 605 F. App'x at 481-83. The court's limited analysis of improper means does not include an exception based on access authorized in the scope of employment. In fact, apart from discussing that defendant was a former employee who accessed a trade secret—namely, among other things, technology—during his employment, the court in *Stolle Mach. Co.* does not broadly discuss the requirements nor the implications of improper means by employees. The court, instead, explores jurisdiction in great detail and finds that the plaintiff employer's claims against defendant former employee were time barred. Furthermore, Attorney Hewitt cites to page 486, but at that page, the court concludes its discussion of conspiracy to misappropriate trade secrets and begins its analysis of the Lanham Act. *Id*. at 486.

Attorney Hewitt also asserts that "[i]nformation that is routinely disclosed to third parties or shared in the ordinary course of regulated business does not derive independent economic value from secrecy and cannot qualify as a trade secret," citing *Mike's Train House, Inc. v. Lionel*, L.L.C., 472 F.3d 398, 410–11 (6th Cir. 2006) and a second citation that is discussed above. (Hewitt Med. Stmt. at 7). Attorney Hewitt's assertion does not appear, on its face, in the cited case. *See Mike's Train House, Inc.*, 472 F.3d 398. The court in *Mike's Train House* states that "[f]or information to constitute a trade secret under *Michigan* law, the information must (1) derive economic value from the fact that it is not known to others who could make use of it, and (2) be the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *Id.* at 410 (emphasis added). However, the court ventures in the opposite direction of Attorney Hewitt's assertion, affirming its previous findings that "a new combination of *known* steps or

8

processes can be entitled to trade-secret protection" and agreeing with the Seventh Circuit that a plaintiff's failure to "point to specific items within its [materials] that are not known by the industry" should not preclude claims related to trade secrets. *Id*. at 411 (emphasis added) (internal citations omitted). The court also states that, "[w]hen material such as design drawings or manuals are trade secrets based on a unique combination of both protected and unprotected material, a plaintiff should not be obligated to identify which components of the protected material is secret." *Id.* More plainly, the court in *Mike's Train House* emphasizes that trade secrets can exist even when some components of the information are publicly known or disclosed, so long as the combination of the information as whole afford a competitive advantage and is subject to reasonable efforts to maintain secrecy.

Next, Attorney Hewitt avers that "[a] plaintiff must show ownership or exclusive possession of the alleged trade secret; failure to restrict access or establish exclusive control defeats the claim," citing *Heartland Home Fin., Inc. v. Allied Home Mortg. Capital Corp*., 258 F. App'x 860, 861–63 (6th Cir. 2008). (Hewitt Med. Stmt. at 8). While the topic of ownership or exclusive control can be implied from the elements for misappropriation outlined in *Heartland*, the case itself does not discuss exclusive control nor ownership of a trade secret. *See Heartland Home Fin., Inc.*, 258 F. App'x at 861-62. Moreover, the Sixth Circuit has recognized that the "formulation of the prima facie case" set forth in *Heartland* "is likely outdated in light of the Uniform Trade Secrets Act (UTSA)." *Kendall Holdings, Ltd. v. Eden Cryogenics, LLC*, 521 F. App'x 453, 457 (6th Cir. 2013) (citing Restatement (Third) of Unfair Competition § 40 cmt. b (1995) (explaining that UTSA imposes liability not just for the wrongful use or disclosure of a trade secret, as case law often recites, but also for its acquisition by improper means); *see also State ex rel. Besser v. Ohio State Univ.,* 89 Ohio St.3d 396, 732 N.E.2d 373, 378 (2000) (noting

9

that broader definition of "trade secret" in OUTSA "extends protection to a plaintiff who has not yet had an opportunity or acquired the means to put a trade secret to use" (citation omitted))).

Attorney Hewitt also contends that "[t]o state a civil CFAA claim, a plaintiff must plausibly allege access to a computer without authorization or exceeding authorized access, and a qualifying statutory loss of at least $5,000 within a one-year period," citing "*Pulse Home, Inc. v. Laborers' Int'l Union of N. Am.*, 648 F.3d 295, 301–03 (6th Cir. 2011)." (Hewitt Med. Stmt. at 8). Attorney Hewitt continues by asserting "[t]he Sixth Circuit construes the CFAA narrowly; it targets hacking, not misuse of information obtained through authorized access," specifically citing to page 303. *Id.* Notably, the correct spelling is "*Pulte Homes, Inc.*," not "*Pulse Homes, Inc.*" 648 F.3d 295. The decision in *Pulte Homes* supports Attorney Hewitt's assertion that a plaintiff must allege access to a computer without authorization to state a CFAA access claim. *Id.* at 303. However, the case does not discuss a qualifying statutory loss of at least $5,000 within a one-year period. Additionally, *Pulte Homes* does not discuss that the CFAA should be narrowly construed, nor does it determine the purpose or scope of the statute as being primarily for hacking.

Next, Attorney Hewitt asserts that "[t]he CFAA's loss provision is limited to costs incurred in responding to a security breach or restoring systems, not investigation expenses or litigation costs," citing to *Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*, 774 F.3d 1065, 1072–73 (6th Cir. 2014). (Hewitt Med. Stmt. at 8). Contrary to Attorney Hewitt's assertion, the court in *Yoder* found that "loss" under the CFAA included both the costs associated with the investigation of the offense and the damage assessment. *Yoder & Frey Auctioneers*, 774 F.3d at 1074 (citing *A.V. ex rel. Vanderhye v. iParadigms, LLC,* 562 F.3d 630, 646 (4th Cir. 2009) (holding that "loss" is broadly defined and "plainly contemplates ... costs incurred as part

of the response to a CFAA violation, including the investigation of an offense")).

Turning to breach of contract claims, Attorney Hewitt argues that "[c]onduct authorized or reasonably contemplated by the employment relationship cannot constitute breach" and cites to *Lucarell v. Nationwide Mut. Ins. Co.*, 152 Ohio St.3d 453, 2018-Ohio-15, ¶ 44. (Hewitt Med. Stmt. at 9). The paragraph cited by Attorney Hewitt simply states, "Courts in Ohio have therefore recognized that there is no independent cause of action for breach of the implied duty of good faith and fair dealing apart from a breach of the underlying contract." *Lucarell*, 152 Ohio St.3d 453, at ¶ 44 (citations omitted). Regarding breach of contract claims, the *Lucarell* court considered whether punitive damages are available for breach of contract claims and whether there is a separate cause of action for breach of the implied duty of good faith and fair dealing. *Id.* at ¶¶ 35-47. The court does not directly contemplate Attorney Hewitt's assertion.

In his intentional infliction of emotional distress section, Attorney Hewitt avers that "[k]nowingly false accusations of criminal conduct and retaliatory professional destruction may satisfy this standard," citing to *Reamsnyder v. Jaskolski*, 10 Ohio St.3d 150, 153 (1984). (Hewitt Med. Stmt. at 12). While the *Reamsnyder* case contemplates the bounds of intentional infliction of emotional distress, the court does not make the finding asserted by Attorney Hewitt nor do the facts of the case give rise to its reasonable inference. *See Reamsnyder*, 10 Ohio St.3d 150. It is possible to take the standard articulated in the case and use it to encompass the asserted conduct, but only if the conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 394 (quotation marks and citation omitted). As it stands, Attorney Hewitt's assertion fails to make that important distinction.

Finally, Attorney Hewitt asserts that "[p]unitive damages are available where defendants

11

act with actual malice or conscious disregard for the rights and safety of others," citing to *Preston v. Murty*, 32 Ohio St.3d 334, 336 (1987) and *Calmes v. Goodyear Tire & Rubber Co.*, 61 Ohio St.3d 470, 473 (1991). (Hewitt Med. Stmt. at 13). Attorney Hewitt is incorrect that punitive damages require proof of either actual malice or conscious disregard. Instead, conscious disregard is one way to show actual malice. *See Preston*, 32 Ohio St. 3d at 336. In *Preston*, the Supreme Court of Ohio held: "actual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Id.* In *Calmes*, the Supreme Court of Ohio (citing *Preston*) sets forth the same standards. *Calmes*, 61 Ohio St.3d at 473.

### b. Defendant Scott's Mediation Statement

While Defendant Scott's mediation statement is devoid of unidentifiable authority, the statement suffers from the same discrepancies found in Attorney Hewitt's statement—namely, cites to unrelated authority or assertions that misstate cited authority.

#### i. Unrelated Authority

First, Defendant Scott cites to authority that is completely unrelated to the relevant assertions. For example, Defendant Scott asserts that "[a] demand for settlement through lawful claims is not extortion," citing *Tilberry v. McIntyre*, 135 Ohio App.3d 229, 241 (8th Dist. 1999) and *First Fed. Bank of Ohio v. Angelini*, 2012-Ohio-2136, ¶ 31 (3rd Dist.). (Scott Med. Stmt. at 3). Although *Tilberry* arguably supports Ms. Scott's assertion, *First Fed. Bank of Ohio* does not. In *First Fed. Bank of Ohio*, the court's discussion of extortion is very limited:

> Simply put, Ohio law does not recognize a civil action for extortion. Thus, the counterclaim was based upon a legal nullity. It could not be supported by a good faith argument for an extension, modification, or reversal of existing law, nor could it be supported by a good faith argument for the establishment of new law. As such, its assertion under these circumstances constituted a willful violation of Civ.R. 11 and frivolous conduct under R.C. 2323.51.

2012-Ohio-2136, at ¶ 14. Furthermore, Defendant Scott cites to ¶ 31, and there is no ¶ 31 in the case.

Defendant Scott also contends that "[t]hreatening to file suit, even forcefully, is lawful," citing "*Mumaw v. Thistledown Racetrack LLC*, No. 1:13-cv-1048, 2015 WL 667318, at *4 (N.D. Ohio)." (Scott Med. Stmt. at 3). In *Mumaw*, the court primarily addresses personal jurisdiction. The court's discussion of extortion is incredibly limited: "Defendant contends and Plaintiffs concede, that Ohio does not recognize a civil cause of action for extortion. *See Groves v. Groves*, No. 09AP1107, 2010 WL 3722641, 7 (Ohio App. 10 Dist., Sept 23, 2010) ("no civil cause of action for extortion exists.")." *Mumaw*, 2015 WL 5437747, at *6. Furthermore, Defendant Scott's Westlaw citation, 2015 WL 667318, is incorrect; the correct citation is 2015 WL 5437747.

Defendant Scott avers "[r]eporting or warning of reporting alleged misconduct is lawful" and cites to *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415, 419 (1995). (Scott Med. Stmt. at 3). In *Kenty*, the Ohio Supreme Court recognizes the tort of tortious interference with a contract and addresses a civil conspiracy claim. It does not discuss the legality of reporting or warning of reporting alleged misconduct.

Defendant Scott asserts that "[t]ruthful statements about foreseeable public consequences are not threats," citing *Hecht v. Levin*, 66 Ohio St.3d 458, 461 (1993). (Scott Med. Stmt. at 3). However, in *Hecht*, the Ohio Supreme Court held:

13

> (1) a complaint filed with the grievance committee of a local bar association is part of a judicial proceeding; (2) a statement made in the course of an attorney disciplinary proceeding enjoys an absolute privilege against a civil action based thereon as long as the statement bears some reasonable relation to the proceeding; and (3) R.C. 2305.28 does not apply to attorney disciplinary proceedings held under the authority of the Supreme Court of Ohio.

*Hecht*, 66 Ohio St. 3d at 465. The Court does not discuss threats.

Finally, Defendant Scott posits that the "[a]buse of process occurs when litigation is used for an ulterior purpose unrelated to adjudication. Such claims are not barred by privilege," citing to *Yaklevich v. Kemp*, 68 Ohio St.3d 294, 298 (1994). (Scott Med. Stmt. at 4). Although *Yaklevich* supports the first sentence, it does not support the second (regarding privilege). Indeed, the word "privilege" is not mentioned in the case. Further, Judge Rice addressed this in his Decision and Entry, finding that Ohio courts "have enforced the litigation privilege as an absolute defense to virtually every intentional tort when a statement is made in relation to a judicial proceeding." (Doc. #113, *PageID* #2018) (citations omitted). He does note that "courts have consistently rejected attempts to extend a blanket privilege to federal law claims." *Id.* at 2019.

### ii.    Misstated Authority

Second, Defendant Scott cites to authority in a manner that exaggerates or misstates the law throughout her meditation statement.

Regarding extortion claims, Defendant Scott asserts that "[c]ivil liability may arise only under R.C. 2307.60 where a plaintiff establishes all elements of an underlying criminal offense," citing *Jacobson v. Kaforey*, 149 Ohio St.3d 398, 2016-Ohio-8434, ¶¶ 6–13. (Scott Med. Stmt. at 3). In *Jacobson*, the Ohio Supreme Court holds that the current version of O.R.C. 2307.60

14

independently authorizes a civil action for damages caused by criminal acts, unless otherwise prohibited by law. 2016-Ohio-8434, ¶ 6. The Court later specifies:

> We make no ruling today beyond answering the certified-conflict question. Any ensuing issues regarding how the statute operates or what a plaintiff must do to prove a claim under R.C. 2307.60(A)(1) are beyond the scope of this appeal. Resolution of issues of that type by this court must await an appeal in a case in which the issues are properly before the court.

*Id.* at ¶ 11 (emphasis added).

Defendant Scott also states that "IIED requires extreme and outrageous conduct. Knowingly false criminal accusations and retaliatory litigation tactics satisfy this standard" and cites to both *Yeager v. Local Union 20*, 6 Ohio St.3d 369, 374 (1983) and *Reamsnyder v. Jaskolski*, 10 Ohio St.3d 150, 153 (1984). (Scott Med. Stmt. at 3). In *Yeager*, the Ohio Supreme Court recognizes the tort of intentional infliction of emotional distress and sets for the requirements for a claim. *Yeager*, 6 Ohio St.3d at 374. However, the Court does not hold that false criminal accusations and retaliatory litigation tactics satisfy the standard. Furthermore, in *Reamsnyder*, the Ohio Supreme Court found that (1) conduct of insurance representative during telephone calls with plaintiff, whose wife had claim against insured, did not amount to outrageous conduct, but (2) allegation that automobile rental agency employee threatened to "tear" plaintiff's "face off" if he did not return automobile did support a claim for intentional infliction of emotional distress. *Reamsnyder,* 10 Ohio St. 3d at 153. The court does not discuss whether false criminal accusations and retaliatory litigation tactics satisfy the standard.

Turning to tortious interference with business relationships, Defendant Scott avers that "Ohio protects existing and prospective business relationships. False accusations intended to disrupt attorney-client relationships constitute improper means," citing *Kenty*, 72 Ohio St.3d at

15

419 and *Fred Siegel Co. v. Arter & Hadden*, 85 Ohio St.3d 171, 176 (1999). (Scott Med. Stmt. at 3). While *Kenty* could arguably support Defendant Scott's first sentence ("Ohio protects existing and prospective business relationships."), it does not support her statement regarding false accusations. Additionally, *Fred Siegel* does not support Defendant Scott's assertion; although the Court discusses attorney-client relationships in the context of tortious interference with a contract, the Court does not address false accusations or whether they constitute improper means.

Finally, like Attorney Hewitt, Defendant Scott argues "[p]unitive damages are available upon proof of actual malice or conscious disregard," citing *Preston*, 32 Ohio St.3d at 336 and *Calmes*, 61 Ohio St.3d at 473. (Scott Med. Stmt. at 4). Defendant Scott is incorrect that punitive damages require proof of either actual malice or conscious disregard. Instead, as noted above, conscious disregard is one way to show actual malice. In *Preston*, the Supreme Court of Ohio held "actual malice … is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." 32 Ohio St. 3d at 336. In *Calmes*, the Supreme Court of Ohio (citing *Preston*) sets forth the same standard. 61 Ohio St.3d at 473.

## IV.     Conclusion

Therefore, after careful consideration of the record and the representations of counsel, the undersigned finds that the conduct at issue constitutes attorney misconduct and undermines the integrity of the mediation process. The undersigned hereby declines to conduct further mediation proceedings in this matter. The undersigned hereby **REFERS** this matter back to the

assigned District Judge for further action as the Court deems appropriate.

**IT IS SO ORDERED.**

February 19, 2026                                         *s/Peter B. Silvain, Jr.*
                                                           Peter B. Silvain, Jr.
                                                           United States Magistrate Judge